**From:** Jane Kirtley [kirtl001@umn.edu]
**Sent:** Monday, August 01, 2005 5:18 PM
**To:** LRComments
**Cc:** Jane Kirtley
**Subject:** Silha Center comments on Proposed Amendments to Local Rules
**Attachments:** silhacenterlocalrulecommentsrhodeislandfederaldistrict.doc

Dear Mr. DiMarzio:

Attached, and imported below, are the comments of the Silha Center for the Study of Media Ethics and Law on Proposed Amendments to Local Rules.

Please contact me if you have any questions.

Jane E. Kirtley
Silha Professor of Media Ethics and Law
Director, Silha Center for the Study of Media Ethics and Law
School of Journalism and Mass Communication
University of Minnesota
111 Murphy Hall
206 Church Street SE
Minneapolis, MN 55455
612 625 9038 (voice)
612 626 8012 (fax)
kirtl001@tc.umn.edu (e-mail)

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND**

**Comments of the Silha Center for the Study of Media Ethics and Law on the Proposed Local Rules of the United States District Court for the District of Rhode Island**

The Silha Center for the Study of Media Ethics and Law submits the following comments to the U.S. District Court for the District of Rhode Island in response to the amendments proposed to the Court's Local Rules ("Proposed Local Rules"). The Silha Center is a research center located within the School of Journalism and Mass Communication at the University of Minnesota. Its primary mission is to conduct research on, and promote understanding of, legal and ethical issues affecting the mass media. The Silha Center also sponsors an annual lecture series; hosts forums, conferences and symposia; produces the *Silha Bulletin*, a quarterly newsletter, and other publications; and provides information about media law and ethics to the public.

**INTRODUCTION**

The Silha Center submits comments only on the Proposed Local Rule of General Application ("PLR Gen") 110 and PLR Gen 111(c). The Silha Center urges the Court not to adopt PLR Gen 110 and PLR Gen 111(c) for four reasons. First, PLR Gen 110 is unconstitutionally overbroad because it would restrict the First Amendment free speech rights of attorneys by eliminating the standards in the current Local Rule ("LR") 39. Second, PLR Gen 110 creates incentives for

court employees and other personnel to withhold public information and records contrary to the public interest. Third, PLR Gen 110 is an unconstitutional prior restraint upon members of the public who are litigants because it is not narrowly drawn to serve compelling interests. Finally, the presumptive prohibition on note-taking in PLR Gen 111(c) is overbroad because it ignores the tradition of unobtrusive note-taking and because it acts like a prior restraint.

## ANALYSIS

### I. PLR GEN 110 IS UNCONSTITUTIONALLY OVERBROAD.

PLR Gen 110 states: "Unless authorized to do so by the Court, no counsel . . . shall disclose or disseminate to any unauthorized person information relating to any pending case that is not a part of the public record." PLR Gen 110 should not be adopted because it would violate attorneys' freedom of speech rights protected by the First Amendment. Although the First Amendment standards protecting attorneys' speech are less expansive than those applicable to the general public, PLR Gen 110 would eliminate the constitutionally required free speech protections of LR 39.

#### a. Although The Speech Rights of Attorneys May Be Restricted, The First Amendment Requires Those Restrictions Be Narrowly Tailored.

In *Gentile v. State Bar of Nevada*, 501 U.S. 1030 (1991), the Supreme Court ruled that restrictions on attorneys' free speech need not meet the same high standards as those imposed on the press to survive constitutional scrutiny, but are nevertheless subject to First Amendment review. In *Gentile*, Dominic Gentile was disciplined by the Southern Nevada Disciplinary Board of the State Bar of Nevada after he made statements to the press concerning a criminal case in which he represented the defendant. *Id.* at 1063. The Supreme Court of Nevada upheld the Disciplinary Board's action after finding by clear and convincing evidence that Gentile "knew or reasonably should have known that his comments had a substantial likelihood of materially prejudicing the adjudication of his client's case." *Id.* at 1065 (quotation and citation omitted). The "substantial likelihood" test cited by the court was derived from the local rule of professional responsibility, which was modeled after the ABA Model Rule of Professional Responsibility 3.6. *Id.* at 1067-68.

On appeal, the Supreme Court of the United States recognized that there was a tension between the need for an impartial jury to consider a case based only on evidence admitted at trial and the interests of the public in being informed about the criminal justice system. *Id*. at 1070. The Court noted that because courts historically had authority to discipline attorneys who failed to maintain the integrity of the court, "[i]t is unquestionable that in the courtroom itself, during a judicial proceeding, whatever right to 'free speech' an attorney has is extremely circumscribed." *Gentile,* 501 U.S. at 1071. The Court also found that attorneys representing clients "may be regulated under a less demanding standard than that established for regulation of the press . . . ." *Id*. at 1074. Ultimately, the Court upheld Gentile's discipline because it found that "[t]he 'substantial likelihood' test . . . is constitutional . . . for it is designed to protect [the substantial state interest of] the integrity and fairness of a State's judicial system, and it imposes only narrow and necessary limitations on

lawyers' speech." *Id.* at 1075.

Federal appeals courts in other circuits have interpreted *Gentile* to require the "substantial likelihood" test be applied before a court can restrict the free speech rights of attorneys. In *U.S. v. Scarfo*, 263 F.3d 80 (3rd Cir. 2001), the Third Circuit implicitly accepted that the *Gentile* "substantial likelihood" test was needed to restrict the free speech rights of an attorney who had been dismissed from representing a criminal defendant. *Id.* at 95. The Second and Fourth Circuits have both endorsed the lower standard of a "reasonable likelihood" test, finding that standard constitutional under *Gentile*. *See In re Morrissey*, 168 F.3d 134, 140 (4th Cir. 1999) (finding that although *Gentile* approved the "substantial likelihood" standard, the local rule at issue, using the "reasonable likelihood" standard, "satisfie[d] each of the elements required for constitutionally adequate protection and therefore does not impermissibly infringe on a lawyer's First Amendment rights"); *U.S. v. Cutler*, 58 F.3d 826 (2d Cir. 1995) (accepting implicitly the constitutionality of the "reasonable likelihood" standard in the local rule at issue).

**b. PLR Gen 110 Eliminates The Constitutionally Mandated Specificity In LR 39.**

The standard in LR 39, which would be replaced by PLR Gen 110, is based on the Rhode Island Rule of Professional Responsibility 3.6 and uses the lower "reasonable likelihood" standard approved by the Second and Fourth Circuits. LR 39 also provides specific grounds upon which a court may base a decision to restrict the free speech rights of attorneys. The specificity in LR 39 complies with the constitutional requirement that such a rule be narrowly tailored. *See Gentile*, 501 U.S. at 1076; *In re Morrissey*, 168 F.3d at 140.

PLR Gen 110, on the other hand, is not narrowly tailored, because it provides no specific standards on which an attorney's speech could be judged. Prior to *Gentile*, the Second Circuit ruled in *In re New York Times, Co.*, 878 F.2d 67 (2d Cir. 1989), that an order prohibiting an attorney from speaking with the press between jury selection and return of the jury verdict was unconstitutionally overbroad. The court held that the order was overbroad because "[n]ot only has there been no showing that prejudice may result from statements made to the press by counsel, but there has been no showing that statements are likely to be made at all . . . ." *Id.* at 68. By removing any standard for judging the impact of statements by attorneys, PLR Gen 110 suffers from the same defect as the gag order in *In re New York Times*. PLR Gen 110 assumes that attorneys will make statements to the public and that those statements will be prejudicial without requiring showing of a prejudicial impact.

If the Court adopts PLR Gen 110, it will amount to an unconstitutional restriction on the free speech rights of attorneys recognized in *Gentile*. No other federal court in the First Circuit has such a broad local rule relating to the dissemination of information. The U.S. District Courts for the Districts of Maine, Massachusetts, New Hampshire, and Puerto Rico all have local rules utilizing the "reasonable likelihood" standard in LR 39. *See* Maine LR 157.4(a);

Massachusetts LR 83.2A; New Hampshire LR (Criminal Rules) 57.1(a); Puerto Rico LR 83.7(b). In fact, the local rules of the other federal courts in the First Circuit are even narrower than LR 39 because they apply only to criminal and grand jury proceedings, whereas LR 39 applies to criminal and civil proceedings. *Id.* There is simply no justification for this Court to adopt such a Draconian rule as PLR Gen 110.

## II. PLR GEN 110 CREATES INCENTIVES FOR COURT EMPLOYEES AND OTHER PERSONNEL TO WITHHOLD PUBLIC INFORMATION AND RECORDS CONTRARY TO THE PUBLIC INTEREST.

Courts have long recognized that the common law provides the right to inspect and copy judicial records, subject to reasonable limitations. *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598 (1978). The common law right to access judicial records can be restricted in certain circumstances because "[e]very court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." *Id.* Nevertheless, before a court may exercise its discretion to prevent the release of records to the public, a specific finding based on the facts and circumstances of each request is required. *Id.* at 599.

Although PLR Gen 110 may simply be an attempt to clarify the Court's inherent authority to control records within its purview, it actually creates an incentive for those subject to the rule to withhold information that should be available to the public. Significantly, PLR Gen 110 provides no rationale, much less any compelling circumstances, to justify the wholesale restrictions it would impose on court personnel who routinely provide information to the public.

The ambiguity and vagueness inherent in the rule's requirement that "information . . . that is not a part of the public record" be withheld means that employees and personnel will be inclined to err on the side of caution before talking to members of the press and the public, or making records available to them. Employees facing possible retribution, condemnation, or punishment from supervisors or from the Court under PLR Gen 110 for "improperly" providing information will choose to withhold records that are public and should be publicly accessible. Any uncertainty will most likely be resolved in favor of secrecy, undermining the presumption of open access to the courts.

## III. PLR GEN 110 IS AN UNCONSTITUTIONAL PRIOR RESTRAINT IMPOSED ON MEMBERS OF THE PUBLIC WHO ARE LITIGANTS.

### a. Prior Restraints Are Presumptively Unconstitutional.

Courts have long recognized that the First Amendment protects both speech and the press from government censorship. The Court has held that "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, (1963); *see also Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931). The harm done by a prior restraint is "particularly great when the prior restraint falls upon the communication of news and commentary on current events." *Nebraska Press Ass'n v. Stuart*, 427

U.S. 539, 559 (1976). The Court has determined that prior restraints "are the most serious and the least tolerable infringement on First Amendment rights." *Id.* The presumption of unconstitutionality of prior restraints also applies to the freedom of speech as well as to the freedom of the press. *Tory v. Cochran*, 125 S. Ct. 2108, 2111 (2005); *Nebraska Press Ass'n*, 427 U.S. at 559.

**b. PLR Gen 110 Fails To Overcome The Presumption Of The Unconstitutionality Of Prior Restraints.**

PLR Gen 110 states, "Unless authorized to do so by the Court, no . . . party . . . shall disclose or disseminate to any unauthorized person information relating to any pending case that is not a part of the public record." Because PLR Gen 110 requires prior approval by the Court before a party – usually a member of the general public – may discuss anything not part of the public record, it constitutes a prior restraint on speech. As such, the burden of justifying its imposition rests with the Court, it must be imposed for only a specific and brief period, and a prompt judicial determination on the merits of the restraint must be provided. *Southeastern Promotions Ltd. v. Conrad*, 420 U.S. 546, 560 (1975); *see also City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 779 (2004) (citing the *Southeastern Promotions* requirements); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) (O'Connor, J., plurality opinion of the Court) (discussing the applicability of the *Southeastern Promotions* requirements to the facts of that case).

PLR Gen 110 fails to meet the requirements for a constitutional prior restraint. First, by requiring a party to request permission from the Court before disclosing or disseminating information, PLR Gen 110 improperly shifts the burden of proof of constitutionality from the censor to the speaker. Second, PLR Gen 110 provides no specific and brief duration for the prior restraint on disclosure or dissemination of information. In fact, the language of PLR Gen 110 appears to allow a prior restraint on a party's free speech as long as that party's case is before the Court, meaning the prior restraint might remain in place for years. Finally, PLR Gen 110 provides no mechanism for a party to challenge the prior restraint imposed by the rule other than by requesting advance authorization, nor, at least on its face, to challenge any denial. Coupled with the vagueness and ambiguity of the term "public record" – for example, is unfiled pretrial discovery material that is not subject to a protective order considered part of the "public record," or is it not? – the adverse impact such a rule would have on First Amendment rights would be profound. It should not be adopted.

## IV. THE PROHIBITION ON NOTE-TAKING IN PLR GEN 111(C) IS UNNECESSARY AND OVERBROAD.

PLR Gen 111(c) states, "Handwritten Notes. Nothing in subsection (a) of this Rule shall prevent any person from taking handwritten notes during a proceeding in Court, provided that such note-taking has been authorized by the presiding judicial official." LR 43 has no prohibition against taking notes during a proceeding in Court; rather, it bans recording and broadcasting in the courtroom and court facilities. PLR Gen 111(c) should not be adopted because it is unnecessary and overbroad. It fails to preserve the long-standing tradition of media note-taking during court proceedings, and goes against the trend of greater media access to court proceedings. In addition, PLR Gen 111(c) has the effect of a prior restraint, but does not contain any of the safeguards necessary for constitutional prior restraints.

**a. Reporters' Note-Taking Is Traditionally Accepted And Improves The Accuracy Of Court Coverage Without Disrupting Court Proceedings.**

Courts have a long history of allowing reporters to take notes during proceedings open to the public.

> A responsible press has always been regarded as the handmaiden of effective judicial administration, especially in the criminal field. Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism.

*Sheppard v. Maxwell*, 384 U.S. 333, 350 (1966); *see also* Kelli L. Sager & Karen N. Fredericksen, *Televising the Judicial Branch: In Furtherance of the Public's First Amendment Rights*, 69 S. Cal. L. Rev. 1519, 1529-35 (1996). The Supreme Court has recognized that "[t]he requirement of a public trial is satisfied by the opportunity of members of the public and the press to attend the trial and *to report what they have observed*." *Nixon v. Warner Communications*, 435 U.S. at 610 (emphasis added).

In light of this long tradition, it is unclear what the rationale for this rule revision would be. Although many courts provide designated areas for members of the media to sit while reporting on court proceedings, in order to facilitate their coverage of those proceedings, a 2002 survey showed that none of the thirteen federal Courts of Appeals banned note-taking by the general public. Akhil Reed Amar, *Architexture*, 77 Ind. L.J. 671, 680 (2002). The Supreme Court has no written rule on note-taking, but has traditionally allowed reporters sitting in the media gallery to take notes. *Id.* Until recently, the high court had a policy of barring members of the public from taking pens or pencils into the public gallery or taking notes during oral arguments; however, it rescinded that policy in November 2002. *Id.*; *see also Visitor's Guide to Oral Argument at the Supreme Court of the United States*, http://www.supremecourtus.gov/visiting/visitorsguidetooralargument.pdf (last visited July 31, 2005). Clearly, none of these courts has found note-taking, in and of itself, to be disruptive or to require regulation. If PLR Gen 111(c) is adopted, Rhode Island's note-taking rules would more restrictive than the Supreme Court, any of the federal Courts of Appeals, and the other district courts in the First Circuit. *See* Maine LR 83.8, Massachusetts LR 33.3, New Hampshire LR 83.7, Puerto Rico LR 83.6(b).

The increasingly common activity of note-taking by jurors during trials demonstrates the benefits of allowing note-taking by the public and members of the media. Note-taking by jurors can be beneficial to the jurors' ability to accurately recall trial details during deliberations. Larry Heuer & Steven Penrod, *Juror Notetaking and Question Asking During Trials: A National Field Experiment*, 18 Law & Hum. Behav. 121, 137, 139-40 (1994). Heuer's and Penrod's study also established that note-taking by jurors does not distract other jurors. *Id.* at 138.

Presumptively permitting note-taking also insures that reporters' coverage of court proceedings is accurate. Requiring reporters to obtain permission before taking notes would be burdensome both to the news media and to the Court, and would have a chilling effect on court coverage. Moreover, PLR Gen 111(c) could have the unintended consequence of reducing the accuracy of reporting in instances where reporters are unable to obtain permission to take

notes.

Note-taking by the public and members of the media is comparable to sketch artists working in the courtroom. Courts have generally viewed sketching as acceptable because it is unobtrusive and not distracting. The Fifth Circuit held in *U.S. v. Columbia Broadcasting System, Inc.*, 497 F.2d 102 (5th Cir. 1974), that "sketching requires only a writing instrument and sketch pad and can be done quite unobtrusively . . . ." *Id.* at 106. In its ruling, the Fifth Circuit also pointed out that "no state or federal court has prohibited the publication of sketches [done in the courtroom]." *Id.* Similarly, a Minnesota court found that sketch artists should be permitted in the courtroom unless it was found that extraordinary circumstances existed in which sketching would disrupt the proceedings or distract participants. *KTTC Television, Inc. v. Foley*, 7 Media L. Rep. 1094 (Minn. 1981).

In fact, the general trend has been towards greater accommodation of new technology in the courtroom, rather than the imposition of more restrictive policies on media access. Increasing use of cameras in state courts demonstrates this recognition that, as a general rule, cameras and other forms of media coverage are not disruptive to the proceedings and do not cause distractions. Nearly 25 years ago, in *Chandler v. Florida*, 449 U.S. 560 (1981), the Supreme Court acknowledged that video cameras and broadcasting equipment were being used more often by state courts because they caused relatively few distractions and disruptions. *Id.* at 576-77, n. 11. Today, the vast majority of states permit television coverage of trials or other court proceedings. *See, e.g.*, Jeffrey S. Johnson, *The Entertainment Value of a Trial: How Media Access to the Courtroom is Changing the American Judicial Process*, 10 Vill. Sports & Ent. L.J. 131, 133 (2003).

In extending rules for media access allowing video cameras in the state courts indefinitely, the Rhode Island Supreme Court found that video cameras in the courtroom were usually not disruptive to most proceedings. *In re Permitting of Media Coverage for an Indefinite Period*, 539 A.2d 976, 978-79 (R.I. 1988). Although the court recognized that trial judges had the power to prohibit electronic media coverage in the courtroom in cases where allowing it would disrupt court proceedings, the court acknowledged that the presumption was that cameras were neither distracting nor disruptive, and that a special order was necessary to prohibit video cameras from specific court proceedings. *Id.*

In the context of this trend, any possible rationale for the adoption of PLR Gen 111(c) seems inexplicable. It is true that in *Sheppard v. Maxwell*, 384 U.S. 333 (1966), the Supreme Court found that the defendant's right to a fair trial had been compromised owing to the extraordinary circumstances of that high-profile criminal case, where "bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially [the defendant] Sheppard." *Id.* at 355. The court likened the situation in the courtroom during Sheppard's trial to a "carnival atmosphere." *Id.* at 358. Technology has advanced considerably since then, and electronic recording devices are much more unobtrusive than was the case at that time. But even 40 years ago there was

no suggestion that note-taking by members of the public and members of the media, in and of itself, would have such a disruptive effect as to justify a presumptive ban.

PLR Gen 111(c) would be contrary to the historical tradition of allowing anyone to take notes during court proceedings, and against the trend towards increasing public and media access to the courtroom. By making it more difficult for members of the public and reporters to take notes during proceedings, PLR Gen 111(c) could have the effect of compromising the accuracy of coverage of the judicial system. Note-taking by members of the public and media, like juror note-taking or courtroom sketching, can be, and almost invariably is, done in an unobtrusive manner that causes neither distraction of trial participants nor disruption of the proceedings. The note-taking presumptively forbidden by PLR Gen 111(c) bears no resemblance to the "bedlam" and "carnival atmosphere" found to justify restrictions on the media in *Sheppard*. Because there is no proof that note-taking would be disruptive and there is no compelling reason to change the current policy, PLR Gen 111(c) should not be adopted.

**b. PLR Gen 111(c) Has The Effect Of An Unconstitutional Prior Restraint.**

The Supreme Court has held that one of the "evils that will not be tolerated" is a "scheme that places 'unbridled discretion in the hands of a government official or agency [which] constitutes a prior restraint and may result in censorship.'" *FW/PBS, Inc.* 493 U.S. at 225-26 (quoting *Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757 (1988).). The Supreme Court has also ruled that "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150-51 (1969).

In *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 569 (1980), the Supreme Court stated in the plurality opinion that "at the time when our organic laws were adopted, criminal trials both here and in England had long been presumptively open." In addition to providing for trials open to the public, the Court has found that the First Amendment provides a right of access to the media to attend court proceedings and report on those proceedings. *See Press-Enterprise Co. v. Superior Court,* 464 U.S. 501, (1984) (hereinafter "*Press-Enterprise I*"); *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, (1982).

The Court has also ruled that only reasonable restrictions may be placed on access to criminal trials based on the specific facts and circumstances of each individual case. *Richmond Newspapers*, 448 U.S. at 581-82, n. 18. The Fourth Circuit has held that in order to close court proceedings, a court must engage in a case-by-case analysis to determine whether closed proceedings are "essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *In re Knight Pub. Co.*, 743 F.2d 231 (4th Cir. 1984) (citing *Press-Enterprise I*, 464 U.S. at 509-10). The First Circuit cited *In re Knight Pub. Co.* in ruling that "the constitutionally grounded presumption of

openness simply is too strong to permit . . . burdens to remain in order to avoid harms that will occur only rarely, if at all." *Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 509 (1st Cir. 1989).

The requirement that anyone wishing to take notes at a proceeding of the Court first obtain permission is tantamount to requiring a license before engaging in the right to attend a trial, a right protected by the First Amendment. PLR Gen 111(c), which sets no standards for the granting or refusal of this "license," would give public officials the power to arbitrarily deny a constitutionally protected right. "[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *Lakewood v. Plain Dealer*, 486 U.S. at 757. PLR Gen 111(c) would place "unbridled discretion in the hands" of the Court, seemingly allowing the Court to deny a request by a reporter to take notes at a proceeding of Court based on any reason, or no reason whatsoever. *See id.* As a consequence, PLR Gen 111(c) would act like a prior restraint, and might chill speech by discouraging reporting of court proceedings for fear of inaccuracy in instances where permission to take notes is not obtained.

Moreover, PLR Gen 111(c) is not narrowly tailored to meet the requirement of a constitutional prior restraint. Like PLR Gen 110, PLR Gen 111(c) reverses the presumption against prior restraints by requiring that a person wishing to take notes first obtain permission from the Court. And, unless and until an individual received permission to take notes during a proceeding of the Court, the ban against note-taking would remain in place indefinitely. PLR Gen 111(c) is neither sufficiently narrow nor specific enough to justify restrictions on access based on the facts and circumstances of each case. Instead, PLR Gen 111(c) would presumptively burden the constitutional right of access to any and all trial proceedings "in order to avoid harms that will occur only rarely, if at all." *See Globe Newspaper Co. v. Pokaski*, 868 F.2d at 509.

**CONCLUSION**

For the foregoing reasons, the Silha Center respectfully urges the Court to forego adoption of PLR Gen 110 and PLR Gen 111(c) for four reasons. First, PLR Gen 110 is unconstitutionally overbroad because it would restrict the First Amendment free speech rights of attorneys by eliminating the standards in the current LR 39. Second, PLR Gen 110 creates incentives for court employees and other personnel to withhold public information and records contrary to the public interest. Third, PLR Gen 110 is an unconstitutional prior restraint against members of the public who are litigants because it is not narrowly drawn to serve compelling interests. Finally, the presumptive prohibition on note-taking in PLR Gen 111(c) is unnecessary and overbroad because it ignores the tradition of non-disruptive note-taking and because it acts like a prior restraint.

The Silha Center appreciates this opportunity to provide comments on these Proposed Local Rules.

Respectfully submitted,

Jane E. Kirtley, Director and Silha Professor of Media Ethics and Law
Andrew Deutsch, Silha Research Assistant

Silha Center for the Study of Media Ethics and Law
School of Journalism and Mass Communications
University of Minnesota
111 Murphy Hall
206 Church Street, SE
Minneapolis, MN 55455
(612) 625-3421 (Silha Center office)
(612) 625-9038 (Prof. Kirtley's direct line)
(612) 626-9012 (fax)
kirtl001@tc.umn.edu

**August 1, 2005**