# CATHOLIC UNIVERSITY LAW REVIEW


## ARTICLE

Mixed Signals and Subtle Cues: Jury Independence and Judicial Appointment of the Jury Foreperson

Andrew Horwitz

THE CATHOLIC UNIVERSITY OF AMERICA, COLUMBUS SCHOOL OF LAW

VOL. 54 SPRING 2005 NO. 3

WASHINGTON, D.C.

# MIXED SIGNALS AND SUBTLE CUES: JURY INDEPENDENCE AND JUDICIAL APPOINTMENT OF THE JURY FOREPERSON

*Andrew Horwitz*[+]

## I. INTRODUCTION

Imagine that you are falsely accused of a serious crime and that you are now on trial before a judge and jury. You knew before the trial began that the judge had a reputation as a "law and order" judge, as a judge who was not at all receptive to the arguments of most criminal defense attorneys. You have been watching as the judge and your attorney have been engaged in what appears to be an adversarial battle throughout the trial, but you have taken some comfort in the fact that it will be the jury, not the judge, who will make the factual determinations with respect to your case. As is typical, you and your attorney are more comfortable with some of the jurors than with others, but you hope that one of the jurors in whom you have more faith will become the foreperson and that he or she will control the deliberation process. You also hope that some of your less favored jurors may ultimately be designated as alternate jurors and, therefore, be excluded from the deliberation process. After the judge has instructed the jury on the law, much to your surprise, the judge hand-picks one member of the jury to be the foreperson, exempting that juror from possible designation as an alternate and effectively guaranteeing that that juror will play a dominant role in the deliberation process. What is not surprising, from your point of view, is that the judge has appointed the juror that you and your attorney—and probably the judge as well—have viewed as the most antagonistic to the defense. You believe—with some significant justification—that the judge has inappropriately interfered with the jury's deliberative process. You also believe—again with some significant justification—that the judge has violated your right to have a fair and impartial jury decide the facts of your case. But can these beliefs be successfully litigated in an appellate court? These are the issues that this Article seeks to address.

[+] Associate Professor of Law and Director of Clinical Programs, Roger Williams University School of Law. B.A. 1983, Haverford College; J.D. 1986, New York University School of Law. I would like to thank the Roger Williams University School of Law for providing greatly appreciated financial support for this project and my wife, Alexandra Callam, for providing equally appreciated emotional support.

In any number of jurisdictions across the United States, both state and federal, it appears to be common practice for the trial judge in a criminal case to appoint the foreperson of the jury in a nonrandom fashion. In some jurisdictions, such as Maryland,[1] Massachusetts,[2] and Rhode Island,[3] the trial judge is affirmatively required to appoint the foreperson of the jury. In a number of other jurisdictions judicial appointment of the foreperson appears to be the common practice,[4] while in still others the practice appears to be permitted, even if not necessarily encouraged.[5] Unlike the much more traditional practice of allowing the jury to elect its own foreperson, judicial appointment of the foreperson is fraught with a variety of serious infirmities, many of them of constitutional magnitude. A substantial body of case law and literature—as well as common sense—tells us that anything that a trial judge says or does during a trial is likely to be perceived by all of the trial participants, including the jurors, as a reflection of the judge's personal views and opinions.[6] While that reality is essentially unavoidable, it certainly suggests that judicial influences on the process should be minimized whenever it is practicable to do so. The mere fact that the judge has appointed a particular juror to be foreperson has the potential to convey all sorts of messages to the remaining jurors and to the other trial participants, including that the judge thinks that this juror's judgment is superior to that of other jurors or that this juror's views are in accord with those of the judge.[7] Beyond that set of problems is the issue of whether the trial judge, by appointing the foreperson, who in turn largely controls the dynamics of the jury

---

1. *See* MD. R. 4-312(h) (providing that the court "shall designate a juror as foreman"); *see also* Fitzwater v. State, 469 A.2d 909, 915 (Md. Ct. Spec. App. 1984) (noting the mandatory nature of the rule).

2. *See* MASS. GEN. LAWS ch. 234, § 25 (2000) (providing that the foreperson "shall be appointed . . . by the court"); *see also* Commonwealth v. Campbell, 474 N.E.2d 1062, 1067 (Mass. 1985) (ruling that permitting the jury to elect its own foreperson was error).

3. *See* R.I. SUPER. CT. R. CRIM. P. 24(d) ("Prior to the time the jury retires to commence its deliberations, the court shall appoint one (1) of the jurors to act as foreman."); *see also* D.R.I. R. 15(e)(3) (providing that "the court will select" the foreperson).

4. *See, e.g.*, United States v. Cannon, 903 F.2d 849, 857 (1st Cir. 1990) (taking "judicial notice that it is customary in the district courts" of the First Circuit for the judge to appoint the foreperson); State v. Inman, 350 A.2d 582, 599 n.9 (Me. 1976) (noting that the "practice" in Maine is to have "a court-appointed foreman in all criminal trials"); S.C.R. CIV. P. Form 3 (informing prospective jurors in South Carolina that the judge "appoints one of the jurors to act as foreman").

5. *See, e.g.*, United States v. Martin, 740 F.2d 1352, 1361 (6th Cir. 1984) (holding that the claim that trial court's appointment of foreperson was error was "without merit"); State v. Jaroma, 630 A.2d 1173, 1177 (N.H. 1993) (holding that trial court's nonrandom appointment of foreperson did not "rise[] to the level of a constitutional violation").

6. *See infra* text accompanying notes 172-82.

7. *See infra* text accompanying notes 214-22.

deliberation process,[8] has invaded the jury's right to choose its own leader and its own deliberation dynamics; evidence suggests that the dynamics of the deliberation process can have a significant impact on the results.[9] After some discussion concerning the pervasiveness of judicial appointment of the foreperson and some of the apparent justifications for the practice, the remainder of this Article will be dedicated to an exploration of legal arguments that the judicial appointment of the foreperson violates the defendant's right to a trial by a fair and impartial jury.

## II. PERVASIVENESS AND JUSTIFICATIONS

In a significant number of jurisdictions across the United States, judges routinely appoint one juror to serve as the foreperson of a given jury in a given criminal case, often in a nonrandom fashion. In a few jurisdictions, such as my home state of Rhode Island, this practice is affirmatively required either by statute or by local rule. For example, Rule 24(d) of the Rhode Island Superior Court Rules of Criminal Procedure provides: "Prior to the time the jury retires to commence its deliberations, the court *shall* appoint one (1) of the jurors to act as foreman."[10] In the federal court, Rule 15(e)(3) of the Local Rules of the U.S. District Court for the District of Rhode Island provides that the "court *will* select one of the jurors to act as foreman."[11] A Maryland court rule similarly provides that the court "*shall* designate a juror as foreman."[12] In Massachusetts, the practice is governed by a section of the Massachusetts General Laws that provides that, once a jury has been sworn and empanelled, one of the jurors "*shall* be appointed foreman by the court."[13] Pursuant to that statutory provision, the Supreme Judicial Court of Massachusetts has ruled that it is error for a judge to allow a jury to elect its own foreperson.[14]

In a larger number of jurisdictions, where the practice is not affirmatively required, it nonetheless appears to be common practice for the trial judge to appoint a foreperson rather than allow the jury to elect its own. The First Circuit, for example, has taken "judicial notice that it

---

8. *See infra* text accompanying notes 197-213.

9. *Id.*

10. R.I. SUPER. CT. R. CRIM. PRO. 24(d) (emphasis added).

11. D.R.I. R. 15(e)(3) (emphasis added).

12. MD. R. 4-312(h) (emphasis added); *see also* Fitzwater v. State, 469 A.2d 909, 915 (Md. Ct. Spec. App. 1984) (noting the mandatory nature of the rule).

13. MASS. GEN. LAWS ch. 234, § 25 (2000) (emphasis added).

14. Commonwealth v. Campbell, 474 N.E.2d 1062, 1067 (Mass. 1985). The court held in that case that this error "must be shown to have prejudiced the defendant before reversal is required." *Id.*

is customary in the district courts of this circuit for the judge to do so"[15] and has explicitly upheld the practice.[16] The same is true in Maine, where the Supreme Judicial Court has noted that it is the "practice" to have "a court-appointed foreman in all criminal trials."[17] In New Hampshire, in a case in which the trial judge noted that he had nonrandomly selected the foreperson in "'virtually every criminal case'" over which he had presided, the supreme court upheld that judge's appointment of the foreperson over the defendant's objection.[18] A *Uniform Juror Information Pamphlet* in South Carolina, the contents of which are prescribed by the Supreme Court of South Carolina, advises prospective jurors that the "judge appoints one of the jurors to act as foreman."[19] And in Arizona, Rule 22.1(a) of the Rules of Criminal Procedure explicitly authorizes a trial judge to appoint a foreperson for the jury.[20]

While evidence of the pervasiveness of judicial appointment of the foreperson is not so difficult to find, any written justification of the practice is. One U.S. district court magistrate judge has explained that the person he appoints is "usually someone whom I have observed paying attention to the evidence, instructions and opening and closing arguments of counsel."[21] Another trial judge explained his appointment of the foreperson in a particular case where his doing so was the source of an objection: "'I chose a person to be foreman who, in my opinion,

---

15. United States v. Cannon, 903 F.2d 849, 857 (1st Cir. 1990); *see also* United States v. Bartelho, No. CRIM 95-29-P-H, 2000 WL 761787, at *1 (D. Me. Jan. 3, 2000) (noting that it is the "custom" in the First Circuit for the trial judge to appoint the foreperson at the outset of the trial). There is some isolated evidence, however, that the practice of judicial appointment is not quite so universal as these opinions suggest. *See, e.g.*, MASS. CONTINUING LEGAL EDUC., INC., THE U.S. DISTRICT COURT SPEAKS: DISTRICT OF MASSACHUSETTS § 3.2, at 228-29 (1998) (surveying judges in the U. S. District Court for the District of Massachusetts on how the foreperson is selected, with approximately one-third of the judges indicating that they allow the jury to elect its own foreperson), *available at* WL DCS MA-CLE 186 [hereinafter MCLE, DISTRICT COURT SPEAKS]; Justo Arenas, *Practice in the District of Puerto Rico*, *in* MASS. CONTINUING LEGAL EDUC., INC., FEDERAL CIVIL LITIGATION IN THE FIRST CIRCUIT exhibit 21B (1998), WL FCL MA-CLE S-21-i (reprinting a standing order of Judge Salvador E. Casellas, U.S. District Court Judge in the District of Puerto Rico, stating that he "usually permits the jurors to select the foreperson").

16. *See Cannon*, 903 F.2d at 856-57; United States v. Machor, 879 F.2d 945, 956 (1st Cir. 1989).

17. State v. Inman, 350 A.2d 582, 599-600 & n.9 (Me. 1976).

18. State v. Jaroma, 630 A.2d 1173, 1177 (N.H. 1993) (quoting the trial judge, Associate Justice Bruce E. Mohl).

19. S.C.R. CIV. P. 84 & Form 3.

20. ARIZ. R. CRIM. P. 22.1(a) (providing that, "[a]fter instructing the jury, the court shall appoint or instruct the jurors to elect a foreman").

21. MCLE, DISTRICT COURT SPEAKS, *supra* note 15, § 3.2, at 229 (quoting U.S. Magistrate Judge Charles B. Swartwood of the District of Massachusetts).

appeared to be most attentive during the evidence, and in the deliberations is most able to keep the jury in line with the complicated issues, and I do it purely on a subjective analysis.'"[22] These explanations from the judges would seem to suggest a belief that they are more likely than the jury to be able to identify the juror who is most able to lead a productive and efficient deliberation process. Because some judges make the appointment at the outset of the trial,[23] a selection intended to further the goal of efficiency would necessarily be based on the very limited information one can glean from the jury selection process[24] and would quite possibly be premised upon socio-economic, racial, or ethnic stereotyping. In addition, at least one commentator has suggested that the judicial appointment of the foreperson is actually counterproductive to the goal of efficiency, arguing that, if he or she has been elected with "the support of the majority of jurors, the foreperson is likely to be more effective in the important role of chair of the deliberations."[25] Even if these judges are correct that they can better identify the juror who would be an effective leader, it is clear that, as one court put it, their conscious effort to appoint that person as foreperson constitutes "a deliberate intention by the trial judge to influence the deliberations of the jury,"[26] even if the trial judge has no deliberate intent to influence the outcome.

One commentator has suggested that some judges "have taken the selection [of the foreperson away] from the jury to save time and avert hurt feelings or disappointment."[27] As he goes on to argue, however, there is more than a little irony in taking an important function away from the jury on these grounds, for "if we trust the jury with the responsibility of deciding the case, we should also trust them to select

---

22. Dorshkind v. Harry N. Koff Agency, 134 Cal. Rptr. 344, 347 (Cal. Ct. App. 1976) (emphasis omitted) (quoting California Superior Court Judge Raymond R. Roberts).

23. *See* United States v. Bartelho, No. CRIM 95-29-P-H, 2000 WL 761787, at *1 (D. Me. Jan. 3, 2000). Chief Judge of the U.S. District Court for the District of Maine D. Brock Hornby has indicated that he routinely chooses the jury foreperson "at the outset of the trial." *Id.*; *see also Jaroma*, 630 A.2d at 1177 (upholding trial judge's selection of the foreperson prior to the trial); MCLE, DISTRICT COURT SPEAKS, *supra* note 15, § 3.2, at 229 ("I choose the foreperson at the outset of the trial." (quoting Chief Judge of the U.S. District Court for the District of Massachusetts William G. Young)); *id.* at 228 ("I select the foreperson just before the jury is sworn at the beginning of the trial." (quoting Judge Nathaniel M. Gorton of the U.S. District Court for the District of Massachusetts)).

24. *See* William W. Schwarzer, *Reforming Jury Trials*, 132 F.R.D. 575, 590 (1991) (observing that some judges "designate the foreperson . . . on the basis of the information disclosed during voir dire").

25. *Id.* The opposite may well also be true in many cases because the jurors may give special deference to a foreperson who carries the stamp of judicial approval, but as will be developed later in this Article, that dynamic presents many problems of its own. *See infra* text accompanying notes 224-32.

26. *Dorshkind*, 134 Cal. Rptr. at 347.

27. Schwarzer, *supra* note 24.

their foreperson."[28] The social science research on the subject of the jury's election of the foreperson strongly suggests that the process is generally "very brief, with little discussion of individual merit,"[29] such that any time saved is likely to be minimal. And there is good reason to believe that the discrete task of electing a foreperson in a democratic fashion is a useful first step in creating a productive group dynamic.

One other justification for the practice of judicial selection of the foreperson appears in the legal literature: that a judge can counteract societal biases and prejudices that often lead juries to elect as foreperson the white male of the highest socio-economic status.[30] For example, some years ago Professor Nancy S. Marder suggested that in "jurisdictions where the judge selects the foreperson, she should make sure that women are well represented over time."[31] One can find some support for this justification in the American Bar Association's *Standards for Criminal Justice*, which provides that it is "the responsibility of the trial judge to attempt to eliminate, both in chambers and in the courtroom, bias or prejudice due to race, sex, religion, national origin, disability, age, or sexual orientation."[32] Professor Marder supported her suggestion by arguing that a female foreperson "is more likely than a male foreperson to be concerned about the group's interaction and the need for all to speak and to be heard," and that she will therefore create an environment in which other women "become more outspoken and assertive."[33] While this may well be true, and while the goals that she seeks to promote may well be noble, a trial judge who acts on this sort of motive is engaged in a deliberate attempt to influence the deliberations of the jury. Whether this sort of action on the part of a trial judge can be reconciled with a criminal defendant's constitutional right to trial by a fair and impartial jury—a jury that can and will decide the case free from outside interference or influence—is the subject matter of the remainder of this Article.

---

28. *Id.*

29. *See* Dennis J. Devine et al., *Jury Decision Making: 45 Years of Empirical Research on Deliberating Groups*, 7 PSYCHOL. PUB. POL'Y & L. 622, 696 (2001).

30. The fact that juries tend to behave in this fashion is borne out by social science research on the foreperson election process. *Id.*

31. Nancy S. Marder, Note, *Gender Dynamics and Jury Deliberations*, 96 YALE L.J. 593, 609 (1987). The author of this note, then a law student, is now an Associate Professor of Law at the Chicago-Kent College of Law.

32. STANDARDS FOR CRIMINAL JUSTICE, Standard 6-1.6(d) (3d ed. 1999), WL SCJ 6-1.6.

33. Marder, *supra* note 31, at 610. It may well be that the trial judge in *Maynard v. Readdick*, 196 S.E.2d 688 (Ga. Ct. App. 1973), had these objectives in mind when he "appointed the only female juror as foreman of the jury, rather than allowing the jury to elect its own foreman," *id.* at 689.

## III. RIGHT TO A TRIAL BY A FAIR AND IMPARTIAL JURY

### *A. The Origins and Outlines of the Right*

Recognizing the value and importance of the right to trial by a fair and impartial jury, our Nation's Founders inserted language into the U.S. Constitution, and then again into the Sixth Amendment to the Constitution, explicitly guaranteeing that right in all criminal cases.[34] As the U.S. Supreme Court noted in *Duncan v. Louisiana*:[35]

> Those who wrote our constitutions knew from history and experience that it was necessary to protect against unfounded criminal charges brought to eliminate enemies and against judges too responsive to the voice of higher authority. . . . Providing an accused with the right to be tried by a jury of his peers gave him an inestimable safeguard against the corrupt or overzealous prosecutor and against the compliant, biased, or eccentric judge.[36]

In an earlier opinion, Justice Hugo Black had described the right to trial by jury as "an essential bulwark of civil liberty."[37] But the various arguments in favor of the right to trial by jury make it clear that the right is about far more than simply protecting the innocent against tyranny and corruption. One need explore no further than the opinions of the Supreme Court to find references to a good number of these arguments.

Perhaps first and foremost, the right encompasses the viewpoint that the "common sense" evaluation of the evidence by a group of laypersons may often be preferable to the "professional" evaluation of a trial judge, or at least that the accused is entitled to reach that conclusion with

---

34. Article III, Section 2 of the U.S. Constitution provides: "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury." U.S. CONST. art. III, § 2. The Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed." *Id.* amend. VI. Although both of these provisions suggest that the right to trial by jury applies to all crimes, the U.S. Supreme Court has held through a long line of cases that the right does not apply in cases charging petty criminal offenses. *See, e.g.*, Blanton v. City of N. Las Vegas, 489 U.S. 538, 539, 541 (1989); Baldwin v. New York, 399 U.S. 66, 68-69 (1970); District of Columbia v. Clawans, 300 U.S. 617, 624-25 (1937).

35. 391 U.S. 145 (1968).

36. *Id.* at 156.

37. Galloway v. United States, 319 U.S. 372, 397 (1943) (Black, J., dissenting). In the same opinion, Justice Black quoted Thomas Jefferson's view that the right to trial by jury is "'the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution.'" *Id.* at 397 n.1 (Black, J., dissenting) (quoting 3 WRITINGS OF THOMAS JEFFERSON 71 (Washington ed.)).

respect to his or her case. As the Court noted in *Williams v. Florida*,[38] "[T]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen."[39] That "commonsense judgment of a group of laymen," the Court later explained, acts as a "hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge."[40] Thus, having a group of untrained decision-makers—in part but not exclusively for reasons of independence—has inherent value.

Part and parcel of the recognition of the inherent value of the group of laypersons is the viewpoint that the group of laypersons, more than a single appointed or elected judge, will be representative of community values. A verdict rendered by an impartial jury should generally carry more moral force and legitimacy with the trial participants and in the community precisely because it comes from a fair cross section of that community rather than from one government official. The Supreme Court has recognized this virtue of the right to trial by jury in any number of opinions, suggesting that the process of jury deliberation incorporates "community participation and shared responsibility"[41] and that a jury verdict represents "the commonsense judgment of the community."[42] In *Witherspoon v. Illinois*,[43] the Court stated that "one of the most important functions any jury can perform . . . is to maintain a link between contemporary community values and the penal system."[44] While related to the notion that a jury serves to protect against governmental corruption or tyranny, the Court has recognized that the jury serves a community function above and beyond that role.

The right to trial by jury also draws strength from the viewpoint that there is inherent value in having more than one decision-maker. Having more decision-makers, particularly if they are representative of a fair cross-section of the community, ensures a broader diversity of perspectives and, therefore, suggests a more reliable result. The

---

38. 399 U.S. 78 (1970).

39. *Id.* at 100.

40. Taylor v. Louisiana, 419 U.S. 522, 530 (1975). Similarly, in *Duncan*, the Court restated the view of the Framers that if the accused "preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it." 391 U.S. at 156.

41. *Williams*, 399 U.S. at 100.

42. *Taylor*, 419 U.S. at 530.

43. 391 U.S. 510 (1968).

44. *Id.* at 519 n.15; *see also* Ring v. Arizona, 536 U.S. 584, 616 (2002) (Breyer, J., concurring) (expressing the view that only a jury and not a judge should be permitted to impose a death sentence because a jury is "better able to determine in the particular case the need for retribution").

Supreme Court held in *Ballew v. Georgia*[45] that having a jury that consists of fewer than six persons violates a defendant's Sixth Amendment right to be tried by a jury.[46] Taken in conjunction with the general requirement of jury unanimity in a criminal case,[47] it becomes clear that the size of the jury, in and of itself, is viewed as having inherent value. Indeed, the underlying premise of our adversarial system of adjudication appears to be that "an impartial jury—valued because of its size, breadth of experience, and especially its independence—can and should decide the case."[48]

### *B. The Right To Have the Jury, Not the Judge, Make Findings of Fact*

In a recent line of cases, the U.S. Supreme Court has issued a series of decisions that vigorously protect a defendant's right to have critical factual determinations made by a jury, not a judge. In 1999, the Court in *Jones v. United States*[49] reversed a defendant's conviction for carjacking, holding that the federal statute that created the offense had been wrongly interpreted by the lower courts.[50] In essence the Court held that because the maximum sentence permitted under the statute was determined by certain factual findings, those factual findings must be viewed as elements of the offense and, therefore, must be determined by the jury.[51] In reaching its decision, the majority summarized the historical origins of the Sixth Amendment right to trial by jury, noting that this particular right, perhaps more than many others found in the U.S. Constitution, must be guarded against all incursions.[52] As the Court noted, "Americans of the [colonial] period perfectly well understood the lesson that the jury right could be lost not only by gross denial, but by erosion."[53]

The following Term, in the landmark case of *Apprendi v. New Jersey*,[54] the Court solidified its commitment to the principles enunciated in *Jones*. In *Apprendi*, the Court struck down a New Jersey statute that allowed a

---

45. 435 U.S. 223 (1978).

46. *Id.* at 243-45.

47. In *Apodaca v. Oregon*, 406 U.S. 404 (1972) (plurality opinion), the U.S. Supreme Court held that jury unanimity was not constitutionally required in criminal cases, *id.* at 406. Nonetheless, the majority of jurisdictions in the United States continue to require a unanimous verdict in a criminal case.

48. Steven A. Saltzburg, *The Unnecessarily Expanding Role of the American Trial Judge*, 64 VA. L. REV. 1, 29 (1978).

49. 526 U.S. 227 (1999).

50. *Id.* at 251-52.

51. *Id.*

52. *Id.* at 244-48.

53. *Id.* at 248.

54. 530 U.S. 466 (2000).

judge to impose a sentence above and beyond the statutory maximum for the underlying crime when the judge, not the jury, found that the defendant's purpose was to intimidate his or her victim based on the victim's personal characteristics.[55] Once again, the Court emphasized the critical nature of the right to jury trial, holding that the New Jersey procedure was "an unacceptable departure from the jury tradition that is an indispensable part of our criminal justice system."[56]

Two years later, in 2002, the Court yet again enforced its restrictive protection of the right to jury trial. In *Ring v. Arizona*,[57] the Court struck down Arizona's death penalty statute because it delegated to a judge the power to determine the factors necessary for the imposition of a death sentence.[58] In response to the state's argument that judges may be a better guard against arbitrariness than juries, the Court effectively summarized the heart of its Sixth Amendment jurisprudence in this area:

> The Sixth Amendment jury trial right . . . does not turn on the relative rationality, fairness, or efficiency of potential factfinders. Entrusting to a judge the finding of facts necessary to support a death sentence might be "an admirably fair and efficient scheme of criminal justice designed for a society that is prepared to leave criminal justice to the State. . . . The founders of the American Republic were not prepared to leave it to the State, which is why the jury-trial guarantee was one of the least controversial provisions of the Bill of Rights. It has never been efficient; but it has always been free."[59]

Most recently, in *Blakely v. Washington*,[60] the Court steadfastly maintained the same course. The consequence of the failure to properly delegate a finding of fact to the jury, as all of these Supreme Court cases make clear, is that a resulting conviction or sentence has been obtained in violation of the defendant's Sixth Amendment right to a jury trial and must be vacated.

### C. *The Right To Have the Jury Make Findings of Fact Without Influence from External Sources*

The constitutional right to have the facts of a case decided by a jury incorporates the right to have that jury decide those facts without interference or intrusion from outside forces. As the U.S. Supreme

---

55. *Id.* at 497.
56. *Id.*
57. 536 U.S. 584 (2002).
58. *Id.* at 609.
59. *Id.* at 607 (second omission in original) (quoting *Apprendi*, 530 U.S. at 498 (Scalia, J., concurring)).
60. 124 S. Ct. 2531 (2004).

Court noted in *Turner v. Louisiana*,[61] in which the Court reversed a conviction because of contact between trial witnesses and the jurors, "[t]he requirement that a jury's verdict 'must be based on the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury."[62] For that reason, juries are sternly and repeatedly instructed concerning each juror's obligation to have no contact with any persons involved in the trial, to have no conversations of any kind with anyone about the trial, and to avoid hearing about or reading about the trial in the media.[63] In some cases, the jurors are sequestered during the trial in order to prevent outside interference, intrusion, or influence; in a much higher percentage of cases, the jurors are sequestered during their deliberations for precisely the same reason.[64] The case law that requires that those instructions be given, and the case law dealing with situations in which jurors are found to have violated those instructions, reveal the level upon which the sanctity and purity of the jury's information-gathering and deliberative functions are protected.

In some settings, the mere possibility of improper interference, intrusion, or influence in a jury's fact-finding role requires a court to presume that a criminal defendant has been prejudiced. Once a verdict has been reached, clearly established court rules absolutely prohibit testimony from a juror about the deliberative process or about the extent to which outside interference, intrusion, or influence may have altered the way he or she, or the jury as a whole, viewed the case.[65] For that reason, the absence of prejudice in this sort of situation is virtually unprovable and, therefore, the court's determination that prejudice will be presumed is generally dispositive of the case.

Over a century ago, in *Mattox v. United States*,[66] the United States Supreme Court established the core constitutional principles and jurisprudence in this area of law. In that case, a deliberating jury had been exposed to comments about the case and the defendant by a bailiff as well as to a newspaper article concerning the case.[67] The Court declared, "It is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. Nor can any ground of suspicion that

61. 379 U.S. 466 (1965).
62. *Id.* at 472 (discussing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)).
63. *See, e.g.*, 9TH CIR. CRIM. JURY INSTR. 1.9 (2003).
64. *See* Marcy Strauss, *Sequestration*, 24 AM. J. CRIM. L. 63 (1996).
65. *See, e.g.*, Mattox v. United States, 146 U.S. 140, 149 (1892); FED. R. EVID. 606(b).
66. 146 U.S. 140 (1892).
67. *Id.* at 147.

the administration of justice has been interfered with be tolerated."[68] In order to protect those core principles, the Court set out the general rule: "Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."[69] Because the government could not meet that heavy burden in that case, the Court overturned the conviction and ordered a new trial.[70]

The Supreme Court reconfirmed its commitment to this jurisprudence in *Remmer v. United States*,[71] decided in 1954. In *Remmer*, an unknown person had approached a juror during the trial and told him that the juror could profit by bringing in a verdict for the defense, leading to an investigation and interview of that juror by the Federal Bureau of Investigation.[72] Citing *Mattox*, the Court framed its legal analysis as follows:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . . The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.[73]

Stressing the core principle that the "integrity of jury proceedings must not be jeopardized by unauthorized invasions," the Court remanded the case to the trial court for a hearing to determine the presence or absence of prejudice.[74]

Since it decided *Remmer*, the Supreme Court has presumed prejudice in a handful of other cases involving outside interference with the jury. In *Turner v. Louisiana*,[75] for example, the Court overturned a conviction when two of the deputy sheriffs charged with supervising and escorting the sequestered jury were also central witnesses for the government at the trial. Although there was no evidence to suggest that the sheriffs discussed the case with the jurors, the Court found that "it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these

---

68. *Id.* at 149.
69. *Id.* at 150.
70. *Id.* at 149-53.
71. 347 U.S. 227 (1954).
72. *Id.* at 228.
73. *Id.* at 229.
74. *Id.* at 229-30.
75. 379 U.S. 466 (1965).

two key witnesses for the prosecution."[76] The Court summarized its holding in the following terms:

> It would have undermined the basic guarantees of a trial by jury to permit this kind of an association between the jurors and two key prosecution witnesses who were *not* deputy sheriffs. But the role that [the two witnesses] played as deputies made the association even more prejudicial. For the relationship was one which could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial.[77]

Similarly, in *Parker v. Gladden*[78] the Court overturned a conviction when evidence was adduced that a bailiff assigned to shepherd the sequestered jury told one juror that he thought the defendant was guilty and told another juror that any error in convicting the defendant would be corrected by the Supreme Court.[79] As in *Turner*, the Court stressed that "the official character of the bailiff—as an officer of the court as well as the State—beyond question carries great weight with a jury."[80] The Court found that the "unauthorized conduct of the bailiff 'involves such a probability that prejudice will result'" that it would constitute a per se violation of the Sixth Amendment even in the absence of direct evidence of prejudice.[81]

In the lower courts, a presumption of prejudice has been imposed in a variety of settings beyond those involving juror contact with court personnel or media accounts, highlighting the lengths to which the right to have a jury free from outside influence or interference will be protected. In *United States v. Williams*,[82] for example, the Eighth Circuit reversed a criminal conviction solely because the trial judge failed to instruct the jurors about their obligation to avoid outside influences before he allowed the jury to separate for the evening.[83] Even though there was no showing of "actual prejudice," the court reversed the conviction because the "danger that a wife or husband or other family members could make innocent suggestions during the evening concerning the case or criminal trials in general [was] too serious to be

76. *Id.* at 473.
77. *Id.* at 474.
78. 385 U.S. 363 (1966) (per curiam).
79. *Id.* at 363-64.
80. *Id.* at 365.
81. *Id.* (quoting Estes v. Texas, 381 U.S. 532, 542-43 (1965)).
82. 635 F.2d 744 (8th Cir. 1980).
83. *Id.* at 744.

overlooked."[84] Without explicitly mentioning the right to a jury trial, the court firmly rooted its opinion in constitutional language:

> It is essential to a fair trial, civil or criminal, that a jury be cautioned as to permissible conduct and conversations outside the jury room. Such an admonition is particularly needed before a jury separates at night when they will converse with friends and relatives or perhaps encounter newspaper or television coverage of the trial. It is fundamental that a jury be cautioned from the beginning of a trial and generally throughout to keep their considerations confidential and to avoid wrongful and often subtle suggestions offered by outsiders.[85]

The U.S. Court of Appeals for the District of Columbia has likewise held that a trial court's failure to "admonish the jurors not to discuss the case with any other person until they have rendered a verdict" is a clear violation of the constitutional right to a fair and impartial jury.[86]

Another line of lower court cases, dealing with alternate jurors, serves to illustrate the importance courts have attached to the right to a jury free from outside interference or influence. In the overwhelming majority of jurisdictions, the mere presence of an alternate juror at or after the moment at which deliberations begin constitutes a violation of the defendant's constitutional right to a fair and impartial jury trial and requires a new trial.[87] For example, the Supreme Judicial Court of Massachusetts, in *Commonwealth v. Sheehy*,[88] reversed a murder conviction when three alternate jurors sat in the jury room during the jury's deliberations. As the court explained:

> "Proper respect for the right to jury trial . . . dictates judicial vigilance to ensure, in so far as reasonably possible, that jury deliberations are conducted privately and without extraneous influence." . . . The alternate jurors, whose own views may be influenced by their lack of responsibility for the verdict, may influence the jurors. Even if the alternates do not speak, their presence alone might inhibit some jurors from speaking freely.

---

84. *Id.* at 746.

85. *Id.* at 745-46.

86. United States v. Richardson, 817 F.2d 886, 888 (D.C. Cir. 1987) (citing Coppedge v. United States, 272 F.2d 504, 507 (D.C. Cir. 1959)).

87. State v. Bindyke, 220 S.E.2d 521, 531 (N.C. 1975) (noting that the "overwhelming majority of the decided cases" hold that the presence of an alternate juror during deliberations "is a fundamental irregularity of constitutional proportions which requires a mistrial or vitiates a verdict, if rendered"); Michelle M. Gee, Annotation, *Presence of Alternate Juror in Jury Room as Ground for Reversal of State Criminal Conviction*, 15 A.L.R. 4TH 1127 (1982).

88. 588 N.E.2d 10 (Mass. 1992).

> In order to protect the constitutional right to trial by jury, we have held that the presence of alternate jurors in the jury room during deliberations is an intolerable invasion of the jury's privacy that requires reversal.[89]

The alternate jurors in that case sat against the wall and did not participate in the jurors' discussions.[90] Although the defendant did not object to the presence of the alternates, and although the defendant could not affirmatively establish any prejudice resulting from their presence, the court nonetheless reversed the conviction on constitutional grounds.[91] The court explicitly rejected the Commonwealth's argument that the defendant was not prejudiced by the presence of the alternates, noting that the Commonwealth could "never prove the lack of prejudice" when alternates were present during deliberations because "it is impossible to determine conclusively that their presence, body language, or facial expressions had no effect on the jury without inquiring into the subjective mental processes of the jurors, a query we cannot permit."[92]

Similarly, the Supreme Court of North Carolina, in *State v. Bindyke*,[93] reversed several felony convictions when an alternate juror "remained in the jury room from three to four minutes after the jury retired to consider its verdict."[94] Although there was no direct evidence that the jury had even begun its deliberations, the defendant neither objected nor moved for a mistrial, and there was no evidence proving that the defendant was prejudiced, the court decided to "adopt the majority rule and hold that the presence of an alternate in the jury room during the jury's deliberations violates [the state constitution] and constitutes reversible error per se."[95] The court found that the alternate's presence violated the defendant's right to a trial "by a jury of twelve in the inviolability, confidentiality, and privacy of the jury room," and that any effort to determine prejudice would "necessarily be inconclusive" and would involve further invasion of the jury process.[96]

In the federal system, the Supreme Court issued a ruling in 1993 concerning alternate jurors in the jury room. In that case, *United States v. Olano*,[97] the defendant had consented to having two alternate jurors be

---

89. *Id.* at 12 (first omission in original) (quoting Commonwealth v. Smith, 531 N.E.2d 556, 559 (Mass. 1988)).
90. *Id.* at 10.
91. *Id.* at 10, 12-13.
92. *Id.* at 13.
93. 220 S.E.2d 521 (N.C. 1975).
94. *Id.* at 530, 535.
95. *Id.* at 531, 533.
96. *Id.* at 533.
97. 507 U.S. 725 (1993).

present for the jury's deliberation, although the alternates were instructed not to participate.[98] As the Supreme Court noted, such a practice was in clear violation of Rule 24(c) of the Federal Rules of Criminal Procedure, which requires that any remaining alternate jurors "be discharged after the jury retires to consider its verdict."[99] But because the error was not "brought to the attention of the [trial] court" through an objection, Rule 52(b) of the Federal Rules of Criminal Procedure would allow the conviction to be overturned only if the Court found that the error was one "affect[ing] substantial rights."[100] The majority opinion in *Olano* held that "[t]he presence of alternate jurors during jury deliberations is not the kind of error that 'affect[s] substantial rights' independent of its prejudicial impact."[101] The Court recognized that, at least in theory, the presence of alternate jurors could influence the deliberative process either through their direct verbal or nonverbal participation in the deliberations or through a "chilling" effect on the regular jurors.[102] Nonetheless, because the defendant was unable to show that he was prejudiced in this fashion, the Court upheld the conviction.[103] A vigorous dissent by Justices Stevens, White, and Blackmun argued that the error did affect substantial rights because it "call[ed] into question the integrity of the jury's deliberations," and that the Ninth Circuit acted within its discretionary powers when it reversed the defendant's conviction.[104] Interestingly, even the Court's majority opinion highlighted the fact that, had the trial court allowed the alternate jurors into the jury room over the defendant's objection, the burden would have been on the government, under Rule 52(a) of the Federal Rules of Criminal Procedure, to prove the absence of prejudice,[105] quite possibly an insurmountable burden of proof.[106]

---

98. *Id.* at 728.

99. *Id.* at 737. Rule 24(c) "requires the court to discharge all of the alternate jurors—who have not been selected to replace other jurors—when the jury retires to deliberate." FED. R. CRIM. P. 24(c).

100. Rule 52(b) provides: "PLAIN ERROR. A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." FED. R. CRIM. P. 52(b).

101. *Olano*, 507 U.S. at 737 (alteration in original) (citation omitted).

102. *Id.* at 739.

103. *Id.* at 741.

104. *Id.* at 743-45 (Stevens, J., dissenting).

105. *Id.* at 734.

106. The Court noted that "[w]hether the Government could have met its burden of showing the absence of prejudice" was not at issue in the case. *Id.* at 741. Justice Kennedy, in a concurring opinion, pointed out that a government showing of the absence of prejudice would be "most difficult" given that the rule banning alternates from the jury room during deliberation is "based on certain premises about group dynamics that make it

These lines of cases stand for the proposition that outside interference, intrusion, or influence in jury deliberations will not be tolerated and that certain forms of such interference, intrusion, or influence will lead to a presumption of prejudice that, in actual terms, is virtually impossible to rebut. If interference, intrusion, or influence from sources with less power over a jury than the judge presiding over the case can be of sufficient concern to justify a presumption of prejudice, certainly any risk of the same conduct by the trial judge should make the case for a presumption of prejudice that much more appropriate.

### *D. The Right To Have the Jury Make Findings of Fact Without Influence from the Judge*

The U.S. Supreme Court has noted that even when factual determinations appear to have been properly delegated to the jury, that delegation can be rendered meaningless if the trial judge makes comments that might influence the jury's findings. In *Hicks v. United States*,[107] decided in 1893, the Court reversed a defendant's conviction when the trial judge instructed the jury that the prosecution's witnesses were "telling the truth" and that the defendant's testimony, which contradicted that of the prosecution's witnesses, should be viewed in light of his significant interest in the outcome of the case.[108] The Court noted that the defendant's right to testify was of little value when the judge, "to whose lightest word the jury, properly enough, give[s] a great weight, should intimate that the dreadful condition in which the accused finds himself should deprive his testimony of probability."[109] The Court, noting that it was "not easy to say what effect this instruction had upon the jury," reversed the conviction because of the danger that the judge had influenced the jury's evaluation of the evidence in the case.[110]

The following Term, the Court once again addressed the possibility that a judge's comments during the trial could improperly influence the jury's fact-finding function. In *Starr v. United States*,[111] the Court reversed a murder conviction because the trial judge made a series of inflammatory remarks to the jury.[112] While recognizing that, under federal law, some judicial comment on the evidence is permitted, the Court clarified the trial judge's role and obligations in that regard: "As

difficult for us to know how the jury's deliberations may have been affected." *Id.* at 742 (Kennedy, J., concurring).

107. 150 U.S. 442 (1893).

108. *Id.* at 450-51, 453.

109. *Id.* at 452.

110. *Id.* at 452-53.

111. 153 U.S. 614 (1894).

112. *Id.* at 625-27.

the jurors are the triers of facts, expressions of opinion by the court should be so guarded as to leave the jury free in the exercise of their own judgments."[113] Indeed, the Court suggested that it was "obvious that under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling."[114] Because the judge's comments in that case "were not consistent with due regard to the right and duty of the jury to exercise an independent judgment,"[115] the Court reversed the conviction.[116]

The common law notion that trial judges should be permitted to comment upon the evidence adduced at trial, while still a permissible practice in the federal courts, has been rejected by the vast majority of states[117] and is strongly disfavored by the American Bar Association. The commentary to standard 15-4.2 of the *Standards for Criminal Justice* relating to jury trials explains that judicial comment is disfavored out of "due regard for the respective roles of judge and jury in a criminal trial and the uniquely influential position of the trial judge."[118] The commentary points out that the "potential for abuse, for misunderstanding, for judicial usurpation of the jury's function as fact-finder, and for improperly influencing the jurors is simply too great" for the practice to be endorsed.[119] For just those reasons, the last vestiges of the power to comment upon the evidence, even in the federal system, have been viewed in very narrow terms and abuses have led to frequent reversals.

In *Moody v. United States*,[120] for example, the Fifth Circuit reversed a conviction after a trial judge commended a witness in his instructions to the jury for coming to testify against his relative.[121] The court explained why the judge's "privilege" to comment upon the evidence has been "severely restricted":

> That a jury is highly sensitive to every judicial utterance is axiomatic. A judge's words to the jury carry an authority bordering on the irrefutable. In explaining the law he must

---

113. *Id.* at 625.

114. *Id.* at 626.

115. *Id.* at 626, 628.

116. *Id.* at 627.

117. Michael Pinard, *Limitations on Judicial Activism in Criminal Trials*, 33 CONN. L. REV. 243, 253 (2000).

118. STANDARDS FOR CRIMINAL JUSTICE: DISCOVERY AND TRIAL BY JURY, Standard 15-4.2 cmt. (3d ed. 1996).

119. *Id.*

120. 377 F.2d 175 (5th Cir. 1967).

121. *Id.* at 178.

> present all of the relevant alternate routes which the jury may choose, and in doing so he may, and indeed sometimes he must, analyze and dissect the evidence to insure that the jury comprehends its options and their legal effects. But the judge must take care that the respect or awe which his office engenders does not tend to persuade or lure the jury to defer to his apparent experience and wisdom.[122]

Emphasizing that "[q]uestions of fact must unmistakably be left to the jury," the court condemned the trial judge's comments because they "were readily susceptible of the inference that the defendants were guilty, and the jury might have concluded that the credibility of the witnesses was not its problem."[123] Because the court was "not free from doubt" that the judge's comments "did not have a substantial influence on the jury," the conviction was reversed.[124]

The U.S. Court of Appeals for the District of Columbia has expressed similar views concerning the limitations on the right to comment. In *Billeci v. United States*,[125] the court explained the law regarding the practice in this way:

> The accused has a right to a trial by the jury. That means that his guilt or innocence must be decided by twelve laymen and not by the one judge. A judge cannot impinge upon that right any more than he can destroy it. He cannot press upon the jury the weight of his influence any more than he can eliminate the jury altogether. It is for this reason that courts have held time and again that a trial judge cannot be argumentative in his comments; he cannot be an advocate; he cannot urge his own view of the guilt or innocence of the accused.[126]

The court wrote that "the trial court may not do by indirection that which it may not do directly; that it may not coerce, or attempt to coerce, a jury by gesture any more than it may do so by words."[127] Because the judge in that case said in his charge that he would have instructed the jury to find the defendant guilty if he were permitted to do so, the court reversed the conviction.[128]

Frequently, courts finding abuses of the right to comment have held that a conviction must be reversed even though the trial court explicitly instructed the jury that its views were not controlling. In *Quercia v.*

---

122. *Id.* at 179 (citations omitted).
123. *Id.*
124. *Id.* at 180-81.
125. 184 F.2d 394 (D.C. Cir. 1950).
126. *Id.* at 403.
127. *Id.* at 401.
128. *Id.* at 400, 403.

*United States*,[129] for example, the U.S. Supreme Court reversed a criminal conviction when the judge, in his charge to the jury, commented that the defendant "wiped his hands during his testimony," that such behavior "is almost always an indication of lying," and that the judge personally disbelieved the defendant's testimony.[130] The trial judge specifically instructed the jury that his opinion "is not binding on you, and if you don't agree with it, it is your duty to find him not guilty."[131] The Supreme Court held that this instruction did not cure the error, finding that the judge's "characterization of the manner and testimony of the accused was of a sort most likely to remain firmly lodged in the memory of the jury and to excite a prejudice which would preclude a fair and dispassionate consideration of the evidence."[132]

Similarly, in *United States v. Cisneros*,[133] the Fifth Circuit reversed a criminal conviction in the face of an allegedly curative instruction when the trial judge told the jurors that they could consider "something that [the court] noticed" about a witness's interaction with the defendant as he left the courtroom.[134] The trial judge's comment was "apparently prompted by his belief that he had seen a signal of encouragement or acknowledgment passing between" the witness and the defendant as the witness "left the stand and passed the defense table."[135] After finding that the "credibility issues before the jury were close, difficult, and extremely important," the court noted: "In such a case commenting on the evidence is a perilous endeavor, to be undertaken with caution lest the slightest suggestion of favor for one side or the other from the supposedly impartial moderator tip the balance and impel a decision."[136] In that case, the court rejected the notion that an instruction on the proper fact-finding role of the jury was sufficient to save the conviction: "[T]hough we decline to speculate on the probable efficacy of limiting instructions as a general matter, we believe that the comments here challenged were simply too harmful to be cured by the other instructions."[137] A number of other courts have held the same way.[138]

Improper judicial interference, intrusion, or influence in the jury's fact-finding function has also been recognized in cases that do not involve any

---

129. 289 U.S. 466 (1933).
130. *Id.* at 468, 472.
131. *Id.* at 469.
132. *Id.* at 472.
133. 491 F.2d 1068 (5th Cir. 1974).
134. *Id.* at 1070, 1072.
135. *Id.* at 1073.
136. *Id.* at 1076.
137. *Id.* at 1075-76 (footnote omitted).
138. *See, e.g.*, United States v. Saenz, 134 F.3d 697, 713 (5th Cir. 1998).

overt commentary from the trial judge. Most commonly in this regard, convictions have been reversed because of the manner in which or the extent to which the trial court has questioned a witness at the trial. Because of the risk that a jury might read into a judge's questions a suggestion of the trial judge's views on that witness's testimony, courts have found that certain forms of judicial questioning violate the defendant's right to have the jury weigh the evidence and find facts without interference, intrusion, or influence by the judge.[139]

In *United States v. Hickman*,[140] for example, the Sixth Circuit reversed a conviction after finding that the trial judge repeatedly injected himself into the proceedings by questioning witnesses.[141] "The problem," the court asserted:

> [I]s that potential prejudice lurks behind every intrusion into a trial made by a presiding judge. The reason for this is that a trial judge's position before a jury is "overpowering." His position makes "his slightest action of great weight with the jury."
>
> For this reason, this Circuit has disapproved of extensive questioning of witnesses by a trial judge.[142]

Because the court there was "convinced that[,] judged as a whole, the conduct of the trial judge must have left the jury with a strong impression of the judge's belief of the defendant's probable guilt," it held that the jury was "unable to freely perform its function of independent fact finder."[143] The court rejected the government's argument that the problem was cured by the trial court's instructions to the jury.[144]

Similarly, in *United States v. Bland*,[145] the Eighth Circuit reversed a conviction when it found that the trial court had involved itself with

---

139. A related danger sometimes identified in cases dealing with judicial questioning of witnesses is that the judge's questions, and the answers to those questions, may take on disproportionate weight in the eyes of the jurors. The Fifth Circuit has said that "[w]hen a judge's questions focus on particular portions of a witness's testimony, the jury is likely to attach more weight to the portions on which the judge's questions focus." *Id.* at 710. In a related fashion, answers to a judge's questions may take on added weight in the eyes of the jury because, as the Third Circuit has noted, "[A] jury might think that a witness would be more likely to tell the truth to the judge than to counsel." United States v. Beaty, 722 F.2d 1090, 1094 (3d Cir. 1983). For these reasons, even in the face of jury instructions telling the jury that they are the sole finders of fact, courts have reversed convictions in order to protect the defendant's right to have the jury find facts without judicial intrusion.

140. 592 F.2d 931 (6th Cir. 1979).

141. *Id.* at 931, 933.

142. *Id.* at 933 (citations omitted).

143. *Id.* at 936.

144. *Id.*

145. 697 F.2d 262 (8th Cir. 1983).

questioning several witnesses, each time to the benefit of the prosecution.[146] In explaining its holding, the court stated: "A judge's slightest indication that he favors the government's case can have an immeasurable effect upon a jury. A trial judge should seldom intervene in the questioning of a witness and then only to clarify isolated testimony. A trial court should never assume the burden of direct or cross-examination."[147] After the verdict was returned, the trial judge remarked to the jury that he believed the defendant to be guilty; the appellate court suggested that, while the judge "did not intend to prejudice the defendant's trial," his viewpoint "may have unconsciously driven him to assume a prosecutorial role."[148]

The U.S. Court of Appeals for the District of Columbia has more recently summarized the case law in this area:

> District court authority to question witnesses . . . has limits. Because juries, not judges, decide whether witnesses are telling the truth, and because judges wield enormous influence over juries, judges may not ask questions that signal their belief or disbelief of witnesses. Because such questions can usurp the jury's factfinding function, cast the judge in the role of advocate, and "breach [] the atmosphere of judicial evenhandedness that should pervade the courtroom," they can deprive defendants of fair trials. Judges must therefore strive to preserve an appearance of impartiality and "'err on the side of [a]bstention from intervention.'"[149]

In that case, *United States v. Tilghman*,[150] the court found that "the jury could reasonably have interpreted the judge's pointed comments," which were made while the judge was questioning the defendant, "as reflecting his personal disbelief of [the defendant]."[151] Having so found, the court refused to "speculate about what transpired behind the jury room door" and reversed the conviction.[152] Like the Sixth Circuit in *Hickman* and many other courts before it, the court held that this sort of "interference with jury fact-finding cannot be cured by standard jury instructions."[153]

Drawing upon the logical underpinnings of these holdings, courts have found reversible error even when a judge has neither commented on the

---

146. *Id.* at 266.

147. *Id.* at 265-66 (footnote omitted).

148. *Id.* at 266.

149. United States v. Tilghman, 134 F.3d 414, 416 (D.C. Cir. 1998) (alterations in original) (citations omitted).

150. 134 F.3d 414 (D.C. Cir. 1998).

151. *Id.* at 420.

152. *Id.*

153. *Id.* at 421 (citing United States v. Filani, 74 F.3d 378, 386 (2d Cir. 1996)).

evidence nor intruded into the trial by questioning witnesses. In these cases, as above, courts have stressed that trial courts must make every effort to avoid words or actions that the jury could conceivably interpret as expressing any opinion on the evidence or any partiality to one side. In *People v. Rogers*,[154] for example, the Colorado Court of Appeals reversed a conviction for sexual assault on a child solely because the trial judge personally escorted the child witness to and from the witness stand.[155] The court recognized that the trial judge's intent was to make the child more comfortable and to "minimize the adverse effects upon the child," but held that the trial judge's actions required reversal because the jury "could have perceived the trial court's action as an endorsement of the child's credibility, thus impinging upon the defendant's right to a fair trial."[156] Because a trial court "must be free of even the appearance of bias and partiality," the court stressed that "trial courts should scrupulously avoid taking actions that might give an appearance of partiality."[157] Although the trial judge had given a very explicit instruction concerning her actions, the court nonetheless reversed, finding that no instruction could "'unring the bell' of prejudice to the defendant."[158]

In another, much higher profile case from New Jersey, a court reversed a conviction on several counts of child sexual abuse for quite similar reasons. In that case, *State v. Michaels*,[159] child witnesses testified to the jury through the use of closed-circuit television.[160] As the appellate court explained, the trial judge, "in the televised-view of the jury, played ball with the children, held them on his lap and knee at times, whispered in their ears and had them do the same, and encouraged and complimented them."[161] As in *Rogers*, the court recognized that the judge did not intend to communicate an opinion on the evidence or on the credibility of the children to the jury.[162] Nonetheless, the court reversed due to its concern that, "after this manner of presentation of testimony from nineteen children, [] a jury considering a verdict in favor of the defendant might feel that it was personally offending the judge. The required atmosphere of the bench's impartiality was lost in this trial."[163] Other

154. 800 P.2d 1327 (Colo. Ct. App. 1990).
155. *Id.* at 1328.
156. *Id.* at 1329.
157. *Id.* at 1328.
158. *Id.* at 1329.
159. 625 A.2d 489 (N.J. Super. Ct. App. Div. 1993).
160. *Id.* at 492.
161. *Id.* at 508.
162. *Id.*
163. *Id.*

courts have likewise reversed convictions when a trial judge has rewarded a child witness with candy or other treats in the presence of the jury.[164]

Other forms of nonverbal conduct by a trial judge have been found to be reversible error. For example, in *Abrams v. State*,[165] the Florida District Court of Appeal reversed a criminal conviction when a trial judge, at the conclusion of a key witness's testimony, shook hands and engaged in conversation with that witness in the presence of the jury.[166] Because the jury could have inferred from the judge's actions that he believed the witness to be "a very credible, honest witness," the court found that the trial judge's "inadvertent conduct was prejudicial to the defendant."[167] The court justified its holding by quoting from a case decided close to a century earlier:

> "[G]reat care should always be observed by the judge to avoid the use of any remark in the hearing of the jury that is capable, directly or indirectly, expressly, inferentially, or by innuendo, of conveying any intimation as to what view he takes of the case, or that intimates his opinion as to the weight, character or credibility of any evidence adduced. All matters of fact, and all testimony adduced, should be left to the deliberate, independent, voluntary, and unbiased judgment of the jury, wholly uninfluenced by any instruction, remarks or intimation, either in express terms or by innuendo from the judge, from which his view of such matters may be discerned. Any other course deprives the accused of his right to trial by jury, and is erroneous."[168]

Similarly, the Court of Appeals of North Carolina reversed a conviction when the trial judge "turned his back to the jury for forty-five minutes during [the] defendant's testimony on direct examination."[169] Noting that the trial judge "may not have intended to convey such a message," the court found that the jury could have inferred from the judge's actions

---

164. *See, e.g.*, State v. Cook, 485 So. 2d 606, 609 (La. Ct. App. 1986) (holding that "the trial judge's decision to reward the child witness with candy in the presence of the jury" was reversible error because it "could certainly be viewed by the jury as an indirect comment on this witness' veracity"); State v. R.W., 491 A.2d 1304, 1309 (N.J. Super. Ct. App. Div. 1985) (holding that rewarding a child witness with ice-cream, cookies, and candy in the presence of the jury was reversible error and that the error was such that it "could not be cured by an instruction").

165. 326 So. 2d 211 (Fla. Dist. Ct. App. 1976).

166. *Id.* at 212.

167. *Id.*

168. *Id.* (quoting Lester v. State, 20 So. 232, 234 (Fla. 1896)).

169. State v. Jenkins, 445 S.E.2d 622, 624 (N.C. Ct. App. 1994).

that he "did not believe [the] defendant's testimony to be credible."[170] As the court explained, trial judges

> "must be careful in what they say and do because a jury looks to the court for guidance and picks up the slightest intimation of an opinion. It does not matter whether the opinion of the trial judge is conveyed to the jury directly or indirectly as every defendant in a criminal case is entitled to a trial before an impartial judge and an unbiased jury."[171]

Along the same lines, the Supreme Court of Tennessee reversed a conviction when the trial judge shook his head during defense counsel's summation.[172] Finding that the judge did not intend to convey his opinion on the merits of the case to the jury, the court nonetheless reversed because the jury was "left to speculate" about what caused the judge's actions.[173] And the Appellate Court of Illinois found reversible error when a trial judge "slammed down his pencil, heaved a sigh, and made facial gestures in response to a question posed by defense counsel" during his cross-examination of a prosecution witness.[174] Finding that the defendant "may have been prejudiced in the eyes of some or possibly all of the jurors," the court reversed the conviction.[175] Other courts have taken notice that nonverbal conduct, including turning one's back to counsel, making facial expressions or gestures, and tapping the bench with a pen, can rise to the level of interference, intrusion, or influence in the jury's fact-finding role.[176] At the heart of this entire line of cases is the basic notion that the judge is the central and all-powerful player in the trial and that, because of this fact, the jury will look for any signal at all, whether intentional or inadvertent, conscious or subconscious, for guidance on what to make of the case. As articulated by the Supreme Court of Kansas:

---

170. *Id.* at 625.

171. *Id.* (quoting State v. Sidbury, 306 S.E.2d 844, 845 (N.C. 1983)).

172. Veal v. State, 268 S.W.2d 345, 346 (Tenn. 1954).

173. *Id.*

174. People v. Mays, 544 N.E.2d 1264, 1270 (Ill. App. Ct. 1989).

175. *Id.* at 1272.

176. *See* Allen v. State, 276 So. 2d 583, 586 (Ala. 1973) (stating that "facial expressions, gestures, and nonverbal communications which tended to ridicule defendant and his counsel, could, standing alone, operate so as to destroy the fairness of a trial"); People v. Harmon, 9 Cal. Rptr. 2d 265, 269 (Cal. Ct. App. 1992) (stating that "partiality may be shown by wordless conduct: a dismissive gesture, a look of disbelief, a bored closing of the eyes, or certainly, by turning one's back to a speaker"); State v. Grant, 295 So. 2d 168, 173-74 (La. 1973) (stating that a judge's tapping on the bench with a pen to accentuate a particular jury instruction "could be considered as a prohibited comment upon the evidence").

> "The trial judge occupies a high position. He presides over the trial. The jury has great respect for him. They can be easily influenced by the slightest suggestion coming from the court, whether it be a nod of the head, a smile, a frown, or a spoken word. It is therefore imperative that the trial judge shall conduct himself with the utmost caution in order that the unusual power he possesses shall not be abused."[177]

In a different opinion, that same court put a further gloss on its reasoning:

> These admonitions are prompted by the truism that a jury has a natural tendency to look to the trial judge for guidance, and may find it even where it is not intended. The judge's attitude and the result he supposedly desires may be inferred by the jury from a look, a lifted eyebrow, an inflection of the voice—in many cases without warrant in fact.[178]

All of this is, of course, borne out by the psychological literature relating to the way juries function. As will be developed in the next section of this Article, the application of these principles strongly suggests that the judicial appointment of the foreperson of the jury is an unwarranted and unacceptable intrusion into the fact-finding province of the jury and, therefore, a denial of the defendant's right to have the jury decide the facts without judicial influence or intrusion.

## IV. JUDICIAL APPOINTMENT OF THE FOREPERSON AS A VIOLATION OF THE RIGHT TO A FAIR AND IMPARTIAL JURY

### *A. Lessons from the Case Law*

From a review of the case law outlined above, several core propositions become evident. First, it has been universally recognized that the trial judge is the controlling figure in the courtroom in every respect, orchestrating all aspects of the proceedings from the moment a juror enters the room until the moment he or she leaves it. Second, because jurors generally feel at sea in the largely unfamiliar environment of the courtroom, they look for and receive from the trial judge a series of clues, both verbal and nonverbal, about how to behave, what to say and do and, most importantly, what to believe. Third, essentially the combined effect of the first two, these signals from the trial judge, even if unintended, are likely to have a significant impact on the decision-making process of any individual juror. Particularly because jurors tend

---

177. State v. Hamilton, 731 P.2d 863, 868 (Kan. 1987) (quoting State v. Wheat, 292 P. 793, 797 (Kan. 1930) (Jochems, J., dissenting)).

178. State v. Blake, 495 P.2d 905, 912 (Kan. 1972).

to falsely assume that the trial judge is a truly neutral figure without personal opinions and biases and that the trial judge's experience means that the trial judge has superior wisdom or judgment about the facts of the case, jurors are generally inclined—sometimes consciously, sometimes without awareness—to do what they think the judge wants them to do. And fourth, any "curative" instruction is likely to be largely or completely ineffectual in this context. Using these propositions as a backdrop, this section of the Article will analyze whether the mere selection of the jury foreperson by the trial judge, in and of itself, can rise to the level of improper influence or intrusion into the jury's exclusive role as finders of fact.

The first proposition—that the trial judge is the central and controlling figure in the courtroom—is so self-evident that it hardly needs support. Professor Michael Pinard has summarized the situation particularly well:

> The judge is the dominant figure in the courtroom. The jurors are a captive audience from the moment they first step inside the courtroom as they are, for the most part, either completely inexperienced or marginally experienced in the trial process. They are struck not only by the grandeur of the courtroom setting, but also by the power and prestige possessed by the trial judge.
>
> Moreover, jurors are immediately and repeatedly instructed that they must listen to the judge's each and every word, obey the judge's rulings, and follow the judge's instructions. The judge instructs the jurors as to how they are to behave during the trial, including who they can communicate with about the subject matter of the trial and when they can do so. The judge tells the jurors the time they are to arrive at court, as well as when they can leave. The judge also instructs the jurors about which portions of the trial they can consider during the deliberations, as well as the words and statements—usually in the form of objections that were sustained—that they must erase from their minds as if they were never uttered. Accordingly, the judge is vested with extraordinary power and control over the jury. Quite simply, the jury must do as the judge says.[179]

Spun from the perspective of a trial judge, the scenario looks much the same. As California Superior Court Judge LaDoris H. Cordell has written:

> The psychological exaltation of my role as judge is cleverly reflected in my physical exaltation. My bench (my throne) is

179. Pinard, *supra* note 117, at 271-72 (footnotes omitted).

> several feet higher than the seats of the litigants, jurors, and spectators. It is placed at the head of the room, dead center. My unique status is enhanced by the black robe and the appellation, "Your Honor." Within the confines of my courtroom, surrounded by all of the accoutrements of power, I am the supreme and ultimate voice.[180]

That the judge is the central and most powerful player in a trial courtroom is beyond legitimate debate.

The second proposition—that jurors both consciously and unconsciously look to the trial judge for clues about what to believe, and that they invariably receive these clues—is well documented in the case law and in the literature on jury behavior. As one commentator has explained, when a person "is placed in an unfamiliar situation in which he does not know how to behave," that person "tends to seek out the most experienced person, watch how that person reacts, and then modify his own behavior to agree with the experienced person's behavior. This occurs in a courtroom since the jurors who are unfamiliar with legal proceedings look to the judge for guidance."[181]

While the jurors are busy looking for clues from the trial judge, the trial judge is invariably sending those clues, whether intentionally or unintentionally. Trial judges, like all people, have biases, prejudices, and pre-conceived notions about people and about certain issues.[182] As trials proceed, trial judges cannot help but form opinions and viewpoints of their own, whether they want to or not. As noted trial Judge Marvin E. Frankel has acknowledged, "The jury is likely to discern hints, a point of view, a suggested direction, even if none is intended and quite without regard to the judge's efforts to modulate and minimize his role."[183] This situation is exacerbated by the fact that most trial judges were once trial lawyers and are, therefore, conditioned by years of experience to marshal evidence and draw out inferences to reach particular conclusions. Because, as articulated by Judge Frankel, "qualities of detachment and

---

180. LaDoris H. Cordell & Florence O. Keller, *Pay No Attention to the Woman Behind the Bench: Musings of a Trial Court Judge*, 68 IND. L.J. 1199, 1204 (1993).

181. Elizabeth A. LeVan, Article, *Nonverbal Communication in the Courtroom: Attorney Beware*, 8 LAW & PSYCHOL. REV. 83, 84 (1984).

182. Professor Michael Pinard makes this point well:

> For the most part, judges do not necessarily harbor such biases consciously. Rather, these biases "are often subtle and unconscious." Moreover, judges are in no way unique in harboring such biases and prejudices, as "there is considerable commonsense evidence from our everyday experience to confirm that we all harbor prejudiced attitudes that are kept from our consciousness."

Pinard, *supra* note 117, at 281 (footnotes omitted).

183. Marvin E. Frankel, *The Search for Truth: An Umpireal View*, 123 U. PA. L. REV. 1031, 1043 (1975).

calm neutrality are not necessarily cultivated by long years of partisan combat,"[184] many trial judges struggle to remain truly impartial. Moreover, most trial judges appear to believe that their job is not simply to preside over the presentation of the case, but also to ensure that "justice is done"[185] or that the trial reaches the "right result."[186] For these reasons, some trial judges may send signals to the jury on an entirely conscious and intentional level. But undoubtedly the more pervasive and pernicious reality is that judges are doing so unintentionally and without any conscious awareness, primarily through nonverbal clues. Professor Arthur F. Greenbaum has described the process in these terms:

> All individuals, including judges in the courtroom, manifest nonverbal behaviors. These behaviors, which studies find account for approximately 60 to 65 percent of a person's total communicative output, are particularly important in conveying attitudes and emotions, either purposefully or unintentionally. They occur as inherent parts of normal communication, largely beyond the sender's conscious control. Even when an individual wishes to hide his feelings, research indicates that these feelings will escape through the nonverbal channel.[187]

And the social science evidence suggests that, just as signals can be sent without conscious awareness, they are often received in precisely the same fashion.[188]

In the literature relating to judicial influence over juries, this process of sending and receiving signals, both consciously and without awareness, is commonly explained by reference to the "expectation effect," which is "one of the most well-established phenomena in social science."[189] In recognition of the expectation effect, all legitimate social science experiments are conducted in a "double blind" fashion, meaning that neither the evaluator nor the subject knows whether or not the subject is part of a control group. The research establishing the existence of the expectation effect concluded that when the experimenter knew the

---

184. *Id.* at 1033.

185. *See* Saltzburg, *supra* note 48, at 8 (noting that many judges believe that they have "a special responsibility" to "see that justice is done").

186. *See* Frankel, *supra* note 183, at 1035 (quoting DAVID W. PECK, THE COMPLEMENT OF COURT AND COUNSEL 9 (1954)) (maintaining that "the sole objective of the judge" is to "get at the truth and arrive at the right result").

187. Note, *Judges' Nonverbal Behavior in Jury Trials: A Threat to Judicial Impartiality*, 61 VA. L. REV. 1266, 1270–71 (1975) (footnotes omitted). Arthur F. Greenbaum, the author of this student note, is now a full professor at Ohio State University's Moritz College of Law.

188. *Id.* at 1273.

189. *Id.* at 1269. This phenomenon is sometimes also called the "experimenter bias effect." *Id.*

desired or expected outcome "the experimenter would often unintentionally guide the subject in an effort to 'come out right' and that he could succeed in doing so because the subject would unconsciously search for and respond to that guidance."[190] One commentator described the process, as it plays out in a jury trial, in these terms:

> When judges form beliefs about any aspect of the trial, such as the guilt of the accused or the credibility of certain witnesses, or harbor certain biases against the accused or the defense witnesses, such beliefs and biases may color their behavior consciously or unconsciously. These judges might then ask questions or make comments consistent with those beliefs or biases. . . . [T]hese beliefs "may be manifested either verbally or nonverbally . . . and can be reflected in a judge's comments on evidence, responses to witness testimony, reactions to counsels' actions, or in rulings on objections." These judges may influence the trial proceeding in a manner that reflects their expectations of the outcome. As a result, these judges' preconceived biases or beliefs may improperly influence the jury.[191]

One unhappy consequence of the expectation effect as it plays out in jury trials is that our best efforts to preserve and protect jury independence may be far less effective than we would like to believe. Empirical research has strongly suggested that judges "'leak' their true underlying beliefs or expectations about defendants' guilt or innocence through subtle nonverbal cues. Intentional or unintentional, leakage may influence trial outcome, although the judge may 'appear' to the jurors to be impartial."[192]

The third broad proposition—the great influence that a trial judge wields over the jury's decision-making processes—in many ways simply follows from the first two. The magnitude of the trial judge's influence over the jury "has been recognized since the days of Aristotle"[193] and is

---

190. *Id.*

191. Pinard, *supra* note 117, at 282 (second omission in original) (footnotes omitted) (quoting Peter David Blanck, *Calibrating the Scales of Justice: Studying Judges' Behavior in Bench Trials*, 68 IND. L.J. 1119, 1126 (1993)).

192. Peter David Blanck et al., Note, *The Appearance of Justice: Judges' Verbal and Nonverbal Behavior in Criminal Jury Trials*, 38 STAN. L. REV. 89, 130 (1985). The lead author of this note, then a law student with a Ph.D. in psychology from Harvard University, is now the Charles M. and Marion Kierscht Professor of Law at the University of Iowa College of Law.

193. Lawrence M. Friedman, *The Limits of Judicial Intervention in Criminal Trials and Reversible Error*, 11 GA. L. REV. 371, 378 & n.41 (1977).

taken by appellate courts as an article of faith.[194] The fact that even the subtlest indication from a trial judge concerning his or her views or expectations can have an undue influence on the jurors is generally ascribed to the convergence of a number of factors. As just discussed, jurors, like most people, respond to unfamiliar surroundings by looking for clues about how to behave and what to think. Because the judge is the authority figure and the figure with the most prestige in the courtroom, jurors tend to look to the judge for those clues. Having sought and then received those clues from the trial judge, jurors will do their best to follow them, seeking to avoid the feeling that they have not done their jobs properly or the feeling that they have somehow disappointed the judge; jurors, like most people, aim to do a good job and to please those in a position of authority.

Indeed, psychological studies "offer abundant support for the idea that, for whatever set of reasons, modern man seems incurably dependent upon being told what the 'correct' way to perform is."[195] One commentator, reminded of Milgram's famous experiment establishing that "in a strange context even objectively immoral behavior may be elicited by a legitimate authority figure," noted: "The analogy to the judge, perhaps in his Solomonic role the most legitimate and authoritative of all legitimate authority figures, is clear."[196] Another has said: "In the minds of the jurors, the judge is supreme. He can do no wrong. Jurors seek to avoid the displeasure of the judge. They are reluctant to decide questions of fact contrary to what they believe the views of the judge to be."[197] Again, the words of California Superior Court Judge LaDoris A. Cordell seem particularly apt:

> I no longer wonder about whether or not we judges influence juries, but rather how much and in what way we influence them. . . . The jury attends carefully to the judge, searching out each of her behaviors and imbuing them with meaning. Under such conditions, it is no wonder that jurors and judges agree on verdicts seventy-five percent of the time. It is difficult to imagine any other two bodies that would agree so well. The layout of the courtroom, heightened sensitivity, and the wish to

---

194. The Fifth Circuit, for example, has taken "judicial notice" that "juries are highly sensitive to every utterance by the trial judge." Bursten v. United States, 395 F.2d 976, 983 (5th Cir. 1968).

195. Note, *supra* note 187, at 1276 n.56.

196. *Id.*

197. Leslie L. Conner, *The Trial Judge, His Facial Expressions, Gestures and General Demeanor—Their Effect on the Administration of Justice*, 6 AM. CRIM. L.Q. 175, 177 (1968).

> please that arises from positive transference may well account for such blissful accord.[198]

While much of this process—or at least the part of it that is without awareness—is either difficult or impossible to control, it would seem evident that mechanisms must be in place to reduce the risk of improper judicial influence. One such mechanism, the so-called curative instruction, is the subject of the fourth broad proposition.

The fourth proposition—that so-called curative instructions are largely or completely ineffectual in this context—is as well accepted in the trenches of the judicial system as it is supported by social science research.[199] In the words of U.S. Supreme Court Justice Robert Jackson: "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction."[200] Most practicing judges appear to accept this reality as well; Judge Cordell concluded her comments quoted above by observing the truism that "no matter how much we may admonish them not to, jurors do pay a great deal of attention to the person behind the bench."[201]

In cases in which the trial judge's messages are either sent or received without awareness, curative instructions simply cannot be effective. As Professor Arthur Greenbaum has pointed out, because "the communication often occurs without the conscious recognition of either the sender or the receiver . . . it is difficult to imagine how a standard instruction, one which directs a juror to disregard behavior he does not realize occurred, would purge this influence process."[202] Stated another way, curative instructions "are powerless to remedy prejudice which the juror receives unconsciously."[203] In situations where the juror is aware that he or she has received certain clues from the judge, a curative instruction is equally likely to be ineffective. This is particularly true because psychological research reveals that "individuals tend to resolve message conflicts between verbal and nonverbal channels in favor of the latter."[204] If a juror perceives a conflict between nonverbal messages that he or she has received from a judge and a conflicting curative instruction, "the proclivity of individuals to rely more heavily on the nonverbal

---

198. Cordell & Keller, *supra* note 180, at 1207 (footnote omitted).

199. *See* Devine et al., *supra* note 29, at 666 (summarizing empirical research establishing that curative instructions "have proven to be ineffective" because "jurors are unwilling (or unable) to set aside information that appears to be relevant to determining what happened—regardless of what the law (and thus the judge) has to say about it").

200. Krulewitch v. United States, 336 U.S. 440, 453 (1949) (Jackson, J., concurring).

201. Cordell & Keller, *supra* note 180, at 1207.

202. Note, *supra* note 187, at 1283 (footnotes omitted).

203. *Id.* at 1283-84 n.91.

204. *Id.* at 1283.

messages in such a situation, [makes] it likely that the instruction will be ineffective."[205] In fact, there is good reason to believe that in many situations curative instructions can actually be counterproductive, serving merely to highlight prejudicial information.[206] Presumably for these reasons, the courts in many of the cases cited earlier in this Article have reversed convictions when a jury is exposed to outside influence or interference even in the face of a curative instruction from the judge. As those courts have suggested, the key is to avoid the potentially prejudicial conduct in the first place.

### *B. The Power of the Foreperson*

In legal theory, the foreperson of a jury has no more power or influence than any other member of the jury and plays an essentially ministerial role, serving solely to maintain order in the deliberation process and to act as the voice of the jury in the courtroom.[207] In reality, however, it is a widely accepted proposition in the legal and social science literature that "[a]lmost invariably, the foreman of the jury exerts considerable influence upon the outcome of the case. A foreman often works to translate his viewpoint into the verdict, instead of acting as an

---

205. *Id.*

206. *See* Devine et al., *supra* note 29, at 666 (stating that the studies that have been done on curative instructions suggest not only that they have "proven to be ineffective" but also that they have "been associated with a paradoxical increase in the targeted behavior"); Note, *supra* note 187, at 1284 n.91 (noting that "a curative instruction may in some instances exacerbate the prejudice by reinforcing the cue in the juror's mind"). Most trial lawyers recognize this phenomenon quite well, sometimes opting not to request curative or limiting instructions because of their fear of simply highlighting harmful or prejudicial facts. *See, e.g.*, STEVEN LUBET, MODERN TRIAL ADVOCACY: ANALYSIS AND PRACTICE 295 (2d ed. 1997) (advising trial lawyers that they "may occasionally want to forego the limiting instruction, on the theory that it will only call attention to the harmful evidence").

207. *See, e.g.*, Burke v. Hodge, 97 N.E. 920, 922-23 (Mass. 1912) (noting that the foreman "presides over the deliberations of the jury" and is "the legally recognized voice of the jury," but that "his power is no greater than that of any juror"); People v. Rosa, 471 N.Y.S.2d 793, 794 (N.Y. Sup. Ct. 1984) (acknowledging that "some forepersons may act as leaders," but asserting that the "only function of the foreperson is the ceremonial duty of acting as the jury's spokesperson," that the foreperson "has the same status as any other juror," and that "the law recognizes no special status for the foreperson"). In federal courts, jurors are commonly instructed that the foreperson will "preside over your deliberations" and "speak for you here in court." *See, e.g.*, 1 MODERN FEDERAL JURY INSTRUCTIONS ¶ 9.05 cmt. (Leonard B. Sand et al. eds., 2004). Some academics have proposed that the term "foreperson" be replaced in federal jury instructions with the term "spokesperson" for fear that the foreperson "will be viewed as more important than the other jurors" when the court's intent is that the foreperson should be "one among equals." 1 FED. CRIMINAL JURY INSTRUCTIONS § 3.66 & cmt. (Josephine R. Potuto et al. eds., 2d ed. 1993).

impartial chairman of the deliberations."[208] In presiding over the deliberation process, a foreperson is required to exercise discretion and control in a variety of ways:

> In effect, he or she becomes chairman of the board, often deciding who will be given the floor and for how long, when notes will be sent to the court, when there has been enough discussion of a topic, when a new topic should be discussed, when votes will be taken, [and] whether votes will be by a show of hands or by secret ballot . . . .[209]

Each of these decisions offers an opportunity for the foreperson to exert influence, influence that may be exerted consciously or without awareness.[210]

Study after study shows that the foreperson of a jury will exert this power to decide "who will be given the floor and for how long" by participating in the deliberations more than any other juror, perhaps nearly three times as much on average.[211] Deliberation participation rates are significant because research confirms that "jurors who speak

---

208. Philip J. Hermann, *Predicting Personal Injury Verdicts and Damages*, *in* 6 AM. JUR. TRIALS 966, § 17 (1967); *see also* William Bevan et al., *Jury Behavior as a Function of the Prestige of the Foreman and the Nature of His Leadership*, 7 J. PUB. L. 419, 436 (1958) (finding that, in the dynamics of a deliberating jury, "group opinion reflects to a significant degree the view of an effective leader"); Franklin J. Boster et al., *An Information-Processing Model of Jury Decision Making*, 18 COMM. RES. 524, 541 (1991) (finding that "the foreperson was a very influential group member" and that "the impact of the foreperson relative to other jurors increased more than proportionally as jury size increased"); Ray E. Moses, *Scratching the Juror's Itch: Toward a Model of Fair Deliberative Process*, CHAMPION, Aug. 1997, at 55, 55 (observing that "the foreperson has disproportionate power and control" over the jury's decision-making processes); Lorrie L. Luellig, *Why* J.E.B. v. T.B. *Will Fail To Advance Equality: A Call for Discrimination in Jury Selection*, 10 WIS. WOMEN'S L.J. 403, 431 (1995) (observing that the "foreperson plays a crucial role in determining the verdict"); Marder, *supra* note 31, at 595 (observing that the "foreperson can play a critical role in leading the jury to a verdict").

209. Moses, *supra* note 208; *see also* John F. Manzo, *Taking Turns and Taking Sides: Opening Scenes from Two Jury Deliberations*, 59 SOC. PSYCHOL. Q. 107, 108 (1996) (finding that "jury forepersons exert considerable influence on the shape of jury deliberations, including the organization of turn taking").

210. *See* Note, *supra* note 187, at 1297. Interestingly, many of the same dynamics that apply in the context of a juror seeking and following signals from a judge may also apply in the context of a juror seeking and following signals from the foreperson. As Professor Greenbaum has noted, "[T]he juror in a trial . . . has more than one authority figure to which he may turn for subtle suggestions. The advocates and even the jury foreman may exert considerable influence over a juror during the course of the trial." *Id.* Since research shows that juries, when left to elect a foreperson, will most often select higher status males, and often those with prior jury experience, Devine et al., *supra* note 29, at 696, these dynamics may be quite powerful.

211. *See* Moses, *supra* note 208; Devine et al., *supra* note 29, at 696; Marder, *supra* note 31, at 595.

the most are viewed as the most persuasive by their peers."[212] Even when the foreperson purports to be merely summarizing points raised by other jurors, he or she "is still selecting which comments to emphasize, and consequently, exerting influence on the discussion."[213] Common sense and common experience tell us that an individual with even a moderate level of savvy and sophistication has the skills to control group dynamics, and frequently group decisions, through the use of these techniques.

A significant body of social science research supports these and other conclusions about how and how much the foreperson can influence the deliberation processes of a jury. Even if, as the commonly accepted research indicates, that juries in as many as nine out of ten cases reach a verdict that was preferred by the majority prior to the start of deliberations,[214] that would still leave an extremely large number of trials where the outcome "will necessarily hinge on the deliberation process."[215] A comprehensive review of the social science literature on jury deliberations has concluded that the deliberation style adopted by the jury, which in turn is selected and controlled largely by the foreperson, may be one of the strongest factors in determining whether the eventual jury verdict will be different from the initial inclinations of the majority.[216] For example, when the jury deliberates with a "verdict-driven" style, meaning that it votes early and then focuses its discussion around the verdict, the minority may have less of an opportunity to prevail than when the jury deliberates with an "evidence-driven" style in which an initial vote is deferred until after a systematic evaluation of the evidence.[217] In part, this is because the verdict-driven style sometimes "creates adversarial factions preoccupied with winning the point and silencing the dissenters."[218]

A foreperson can also exert significant influence over the tenor and the direction of the deliberations by his or her selection of polling procedures. Several studies conclude that changes in juror voting can be influenced not only by the timing of the vote but also by the public or secret nature of the vote.[219] Anyone who has ever presided over a group responsible for making a decision recognizes that the taking of a vote at a

---

212. Marder, *supra* note 31, at 596.

213. *Id.* n.13; *see also* Manzo, *supra* note 209, at 122 (observing that "the privilege of summarizing" allows a foreperson "retrospectively to define the extent of agreement or disagreement among the jurors").

214. *See* HARRY KALVEN, JR. & HANS ZEISEL, THE AMERICAN JURY 488 (1966); Devine et al., *supra* note 29, at 690, 701.

215. Devine et al., *supra* note 29, at 701.

216. *Id.*

217. *Id.* at 693, 701.

218. Marder, *supra* note 31, at 602.

219. Devine et al., *supra* note 29, at 694.

moment when the momentum seems to be moving in a certain direction can irretrievably alter the outcome. When a vote is public and sequential in nature, research confirms our common human experience: people have an inherent tendency to change their votes in order to be in accord with the views of the majority.[220] Thus, forepersons can exert influence through their "ability to call for opinion polls at key moments and/or create local majorities by starting the poll with jurors known to have preferences in accord with their own."[221] Indeed, research suggests that, when the strength of the evidence is moderate or when verdict preferences are fairly evenly divided, "the manner in which polls are conducted could have a substantial impact on the final verdict, especially the first poll."[222]

The bottom line in all of this is that two core concepts appear to be beyond contradiction: that judges can exert substantial and disproportionate influence over juries, whether or not they intend to do so, and that the forepersons can exert substantial and disproportionate influence over those same juries, whether or not they intend to do so. The next step in the analysis of the impact of the judicial appointment of the foreperson is to consider these two concepts together.

### *C. The Significance of the Judge's Appointment of the Foreperson*

Because we know that, for a variety of reasons, jurors will "discern hints, a point of view, a suggested direction, even if none is intended and quite without regard to the judge's efforts to modulate and minimize his role,"[223] it is quite safe to assume that jurors will draw meaning from the trial judge's nonrandom selection of one of their own to serve as foreperson. Whether or not they are correct, the jurors are likely to believe that the judicially appointed foreperson is viewed by the judge as in some way superior to the other jurors and, therefore, entitled to more respect and more deference to his or her views.[224] The jurors may speculate that the foreperson was appointed because his or her beliefs appear to be in accord with those of the judge, or at least that the judge thought so. The jurors may speculate that the foreperson was appointed because he or she holds a particular form of status—perhaps prior jury

---

220. *Id.* at 694-95.

221. *Id.* at 698.

222. *Id.* at 701.

223. Frankel, *supra* note 183, at 1043.

224. This is precisely the logic adopted by the court in *Dorshkind v. Harry N. Koff Agency*, 134 Cal. Rptr. 344 (Cal. Ct. App. 1976), which struck down as unconstitutional the judicial appointment of the jury foreperson because it "constitutes an inherent danger to the inviolateness of the jury system," *id.* at 347. For a more thorough discussion of *Dorshkind*, see *infra* notes 263-76 and accompanying text.

service, educational level, race, gender, or social class—that merited appointment as the foreperson. In any event, by nonrandomly appointing the foreperson of the jury, the trial judge effectively enters the jury room and interferes with and influences the deliberative process by designating one juror as superior to the rest and by placing that juror in a position of power and influence.

This process may take place in several different ways, each fraught with its own problems. In many cases, there is good reason to believe that a trial judge will consciously appoint as a foreperson a juror that the judge believes is likely to share his or her verdict preference.[225] While this sort of selection can carry with it a somewhat benign explanation—that the trial judge is simply trying to see that "justice is done"—it is, of course, a textbook example of the judge violating the defendant's constitutional right to have a jury find the facts of the case without outside interference or influence. Interestingly, the specter of this behavior appears in several of the very few cases in which an objection to judicial appointment of the foreperson has been litigated. In the early case of *Bryan v. State*,[226] for example, the trial court appointed as foreperson a juror who had apparently been seated for the trial over a series of defense objections.[227] Similarly, in *United States v. Cannon*,[228] the trial court appointed as foreperson a juror that the defendant maintained "had shown 'distinct hostility' toward defense counsel during the course of the trial."[229] This same process can occur, of course, on an unconscious level, much in the way that an experimenter who desires a certain result can unconsciously act in ways that influence the behavior of his or her subject. In cases such as *United States v. Martin*,[230] in which the trial judge appointed the foreperson of the jury after openly declaring in a bench conference that he believed the defendant to be guilty,[231] the likelihood of such behavior would appear to be quite high.

Those trial judges that appoint the foreperson in a nonrandom fashion must settle upon some criteria for selection, even if they have not done

---

225. Other institutional players can have the same objectives. *See* Moses, *supra* note 208, at 56 (observing that the courtroom bailiff, by giving written instructions to a particular juror, can effectively nominate that juror as foreperson and that the bailiff "usually wants to nominate a juror whom he perceives as pro-prosecution").

226. 260 S.W. 846 (Tex. Crim. App. 1924).

227. *Id.* at 847.

228. 903 F.2d 849 (1st Cir. 1990).

229. *Id.* at 856-57.

230. 740 F.2d 1352 (6th Cir. 1984).

231. *Id.* at 1361. Amazingly, the Sixth Circuit affirmed the defendant's conviction in this case even after it was confirmed at a hearing after remand that one juror had actually heard the judge's remark. United States v. Martin, 757 F.2d 770, 770-71 (6th Cir. 1985) (per curiam).

so consciously. Anecdotal evidence suggests that many judges use entirely subjective observations to inform their selections. As noted earlier, one U.S. magistrate judge has explained that the person he appoints is "usually someone whom I have observed paying attention to the evidence, instructions and opening and closing arguments of counsel."[232] Another trial judge has stated that he "chose a person to be foreman who, in my opinion, appeared to be most attentive during the evidence, and in the deliberations is most able to keep the jury in line with the complicated issues."[233] Some judges make the appointment at the outset of the trial,[234] presumably on the basis of visual information or of information disclosed during the jury selection process.[235] One distinct possibility is that a trial judge will appoint a member of the jury who has prior jury experience; this particular selection criterion is problematic for criminal defendants in light of social science research suggesting that "experienced jurors tend to be somewhat more pro-conviction and influential than inexperienced jurors."[236]

These entirely subjective selection criteria readily lend themselves to all forms of bias and prejudice, whether conscious or unconscious. Even an endeavor as ostensibly straight-forward as identifying the juror who "appeared to be most attentive" is, of course, laden with a variety of cultural biases, as not every culture displays attentiveness in the same fashion. Social science research establishes that juries, when permitted to elect their own forepersons, will most often select a juror who is better educated, holds a higher status job, or comes from a higher social or economic class.[237] Women are notoriously underrepresented as forepersons.[238] Because judges, like the rest of us, have biases and

---

232. MCLE, DISTRICT COURT SPEAKS, *supra* note 15, § 3.2, at 229 (quoting U.S. Magistrate Judge Charles B. Swartwood of the District of Massachusetts).

233. Dorshkind v. Harry N. Koff Agency, 134 Cal. Rptr. 344, 347 (Cal. Ct. App. 1976) (emphasis omitted) (quoting California Superior Court Judge Raymond R. Roberts).

234. *See supra* note 23.

235. *See* Schwarzer, *supra* note 24 (observing that some judges "designate the foreperson . . . on the basis of the information disclosed during voir dire").

236. Devine et al., *supra* note 29, at 677.

237. *Id.* at 696 (summarizing social science research); Marder, *supra* note 31, at 595 n.9 (citing studies finding that those from the "higher classes" are overrepresented among forepersons, that businessmen had a four times better chance of being elected foreperson than male laborers, and that housewives were "never selected"). Interestingly, there is some evidence suggesting that, in a criminal case, "the higher the status of the individual juror the more likely he [is] to vote guilty." John P. Read, *Jury Deliberations, Voting, and Verdict Trends*, 45 SW. SOC. SCI. Q. 361, 366 (1965).

238. *See* Devine et al., *supra* note 29, at 696 (summarizing social science research establishing tendency of the jury to select males); Luelling, *supra* note 209, at 431 (citing a study in which "women constituted 36% of the jurors but only 3% of the forepersons");

prejudices of their own, there is no good reason to believe that these biases and prejudices are not fully brought to bear in the judicial selection of forepersons. After all, most judges probably believe that they would be highly effective forepersons, fully capable of leading the jury to the right decision. If this is so, then those judges are most probably searching, on either a conscious or an unconscious level, for the juror who is most like them. And since white, upper-class males continue to constitute a majority of judges in the United States, the cycle of bias and prejudice continues, but this time at the hands of the judge and not the jury. While it may be troubling to recognize that juries frequently act upon their own biases and prejudices, the important point, at least in this regard, is that they are doing so without outside influence or interference.

Even if a judge, on a conscious level, tries to even out the imbalances caused by bias and prejudice by selecting women, racial or ethnic minorities, or others who would be underrepresented if juries were permitted to elect their own forepersons, the result is still an intentional judicial distortion of the deliberative process. A number of U.S. Supreme Court cases, either directly or through implication, acknowledge the truth that the race or gender of a juror may make a significant difference in the deliberative process. As early as 1880, the Court in *Strauder v. West Virginia*[239] recognized that it was "well known that prejudices often exist against particular classes in the community" and that those prejudices can "sway the judgment of jurors."[240] More than a century later, in his concurring opinion in *Georgia v. McCollum*,[241] Justice Clarence Thomas made this observation about those words:

> I do not think that this basic premise of *Strauder* has become obsolete. The public, in general, continues to believe that the makeup of juries can matter in certain instances. Consider, for example, how the press reports criminal trials. Major newspapers regularly note the number of whites and blacks that sit on juries in important cases. Their editors apparently recognize that conscious and unconscious prejudice persists in our society and that it may influence some juries. Common experience and common sense confirm this understanding.[242]

---

Marder, *supra* note 31, at 595 & n.9 (citing studies establishing underrepresentation of women as forepersons).

239. 100 U.S. 303 (1880).

240. *Id.* at 309.

241. 505 U.S. 42 (1992).

242. *Id.* at 61 (Thomas, J., concurring) (footnote omitted); *see also* United States v. Leslie, 783 F.2d 541, 554 (5th Cir. 1986) (en banc) (noting the potential importance of the race of a juror in the following terms: "To suggest that a particular race is unfit to judge in

Justice Sandra Day O'Connor, dissenting in the same case, wrote that it is "by now clear that conscious and unconscious racism can affect the way white jurors perceive minority defendants and the facts presented at their trials, perhaps determining the verdict of guilt or innocence."[243] She explained that "the outcome of a minority defendant's trial may turn on the misconceptions or biases of white jurors."[244] Consequently, the judicial selection of a white foreperson or of a black foreperson can, in certain circumstances, have an enormous impact on the outcome of a particular criminal case. Whether the selection may be viewed as favoring or disfavoring a criminal defendant is really of little matter, as the point is that the mere selection may significantly interfere with and influence the jury's deliberative process.

Justice O'Connor has written in equally definitive terms that, when it comes to the deliberative process of a jury, "like race, gender matters":[245]

> A plethora of studies make clear that in rape cases, for example, female jurors are somewhat more likely to vote to convict than male jurors. Moreover, though there have been no similarly definitive studies regarding, for example, sexual harassment, child custody, or spousal or child abuse, one need not be a sexist to share the intuition that in certain cases a person's gender and resulting life experience will be relevant to his or her view of the case. "Jurors are not expected to come into the jury box and leave behind all that their human experience has taught them." Individuals are not expected to ignore as jurors what they know as men—or women. . . . [T]he import of our holding [that it is unconstitutional to exercise peremptory challenges based solely upon gender] is that any correlation between a juror's gender and attitudes is irrelevant as a matter of constitutional law. But to say that gender makes no difference as a matter of law is not to say that gender makes no difference as a matter of fact.[246]

Indeed, at least one commentator has explicitly suggested that a judge, in selecting a foreperson, "should make sure that women are well represented over time" because a female foreperson "serves as a role model, thus creating a setting in which other women . . . become more

---

any case necessarily is *racially insulting*. To suggest that each race may have its own special concerns, or even may tend to favor its own, is not.").

243. *McLollum*, 505 U.S. at 68 (O'Connor, J., dissenting).

244. *Id.* at 69 (O'Connor, J., dissenting).

245. J.E.B. v. Alabama *ex rel.* T.B., 511 U.S. 127, 148 (1994) (O'Connor, J., concurring).

246. *Id.* at 148-49 (O'Connor, J., concurring) (citations omitted).

outspoken and assertive."[247] Whether or not the purpose is a noble one, the end result is the intentional manipulation of the jury's deliberative process, the very sort of outside interference and influence that is prohibited by law.

There is one other feature of the judicial appointment of the foreperson that merits particular focus. In some jurisdictions, or in some cases within certain jurisdictions, the foreperson is appointed in advance of the designation of the alternate jurors, thereby assuring that the judge's selected juror will not be discharged from serving on the jury. In Massachusetts, for example, that sequence of events is actually required by statute. The relevant section of the Massachusetts General Laws provides:

> If at the time of the final submission of the case by the court to the jury more than twelve members of the jury who have heard the whole case are alive and not incapacitated or disqualified, the court shall direct the clerk to place the names of all of the remaining jurors, *except the foreman*, in a box and draw the names of a sufficient number to reduce the jury to twelve members.[248]

The Massachusetts Supreme Judicial Court has rejected a constitutional challenge to the provisions of this rule, noting only that it did not "think it important that the foreman was not subject to discharge."[249] The Supreme Court of New Hampshire has likewise upheld the constitutionality of having the trial judge appoint the foreperson of the jury prior to randomly selecting the alternate jurors, thereby exempting that juror from discharge.[250] In neither of these opinions did the court directly address the relationship between the composition of the jury and its deliberative process.

One need not be a very imaginative thinker to envision a case in which a well-intentioned trial judge selects as foreperson the only female juror, the only juror of color, or the only juror holding some other identifiable status. By assuring that that particular juror remains on the jury, the judge has influenced the deliberations that will follow. Indeed, any action by a judge that has an impact on the ultimate composition of the jury will, by definition, alter and influence the deliberative process.

---

247. Marder, *supra* note 31, at 609-10.

248. MASS. GEN. LAWS ch. 234, § 26B (2000) (emphasis added).

249. *See* Commonwealth v. Bellino, 71 N.E.2d 411, 416 (Mass. 1947); *see also* Commonwealth v. Paiva, 453 N.E.2d 469, 471-72 (Mass. App. Ct. 1983) (relying on *Bellino* to deny the same claim).

250. *See* State v. Jaroma, 630 A.2d 1173, 1177 (N.H. 1993).

### *D. Case Law Analyzing the Constitutional Claim*

Litigation concerning the constitutionality of the practice of allowing a trial judge to appoint a jury foreperson has been sparse indeed, and actual legal analysis of constitutional claims has been even sparser.[251] In several of the very few published opinions in which the propriety of judicial appointment of the foreperson is raised, the courts have dispatched with defense objections to the practice with nothing more than an indication that the claim is "without merit."[252] In others, the courts have discussed the merits of the claim solely in relation to a statutory challenge[253] or avoided analysis altogether by finding that the claim was not preserved for review.[254] In the end, there appear to be only two published cases in which the constitutional magnitude of the issue is analyzed in any detail.

In *State v. Jaroma*,[255] the Supreme Court of New Hampshire decided a case in which the defendant argued that the trial judge's nonrandom appointment of the foreperson of the jury denied his "State and federal

251. This author has not been able to locate a single law review article raising the issue and has identified only a dozen published cases in which any sort of challenge to the practice of judicial selection of the foreperson issue is even mentioned.

252. *See* United States v. Machor, 879 F.2d 945, 956 (1st Cir. 1989); United States v. Martin, 740 F.2d 1352, 1361 (6th Cir. 1984); United States v. Bartelho, No. CRIM 95-29-P-H, 2000 WL 761787, at *1 (D. Me. Jan. 3, 2000); *see also* United States v. Cannon, 903 F.2d 849, 856-57 (1st Cir. 1990) (noting simply, and without further analysis or explanation, that "there is no valid reason to prohibit a trial judge from appointing the foreperson").

253. *See* State v. Inman, 350 A.2d 582, 599-600 (Me. 1976) (rejecting the defendant's claim that election of the foreperson by the jurors themselves was statutorily mandated); Bryan v. State, 260 S.W. 846, 847 (Tex. Crim. App. 1924) (finding that the trial judge's appointment of the foreperson of the jury was a violation of the Code of Criminal Procedure). In *Commonwealth v. Campbell*, 474 N.E.2d 1062 (Mass. 1985), the Supreme Judicial Court of Massachusetts resolved a case in which the opposite claim was made—that the judge erred by *not* appointing a foreperson—solely by reference to the governing statute, *id.* at 1067.

254. *See* Maynard v. Readdick, 196 S.E.2d 688, 689 (Ga. Ct. App. 1973) (holding that the claim that "the trial jury has the exclusive prerogative of selecting its own foreman" was not preserved for appeal); Fitzwater v. State, 469 A.2d 909, 915 (Md. Ct. Spec. App. 1984) (citing court rule requiring judicial appointment and holding that claim that appointment invaded the province of the jury was not preserved for appeal); Ballenger v. State, 667 So. 2d 1242, 1258-59 (Miss. 1995) (noting the defendant's argument that judicial appointment of the foreperson "impermissibly endorsed" that juror's views and gave his views "a greater influence on the jury than those of a foreperson selected by the jury itself" and advising future trial judges not to appoint the jury foreperson, but holding that the issue was waived by the lack of a timely objection); Gazaway v. State, 708 So. 2d 1385, 1387 (Miss. Ct. App. 1998) (acknowledging that it was error for the trial court to appoint the foreperson, but refusing to address the issue because it was not properly preserved for review); *see also Machor*, 879 F.2d at 956 (rejecting claim that judicial appointment of the foreperson was error, noting that no objection was raised at trial).

255. 630 A.2d 1173 (N.H. 1993).

rights to an impartial jury, and thus a fair trial."[256] The court noted that the defendant also made "a fleeting reference to a purported denial of his State and federal due process rights," but because the defendant did not "distinguish his due process claims from those involving his right to an impartial jury and a fair trial," the court did not reach them.[257] At the trial, the judge, over the defendant's objection, "nonrandomly selected juror number four to be the jury foreperson prior to choosing the alternate through random selection."[258] In overruling the defendant's objection at the trial level, the trial judge noted that he had "'designated the foreperson'" in "'virtually every criminal case [he had] tried in the last year and a half.'"[259] At least as far as the opinion revealed, the judge offered no reason for his having done so.

The supreme court's analysis of the defendant's constitutional claim, which was confined to one paragraph, pointed out that juror number four, like all the other jurors, had been properly qualified for jury service and had been seated as a juror without defense objection.[260] While the court's opinion clarified what the defendant had *not* argued—he had not argued that juror number four was biased—it provided no information whatsoever about what specific arguments had been advanced either before the trial judge or on appeal and what support, if any, had been

256. *Id.* at 1177.

257. *Id.* In fact, for many of the reasons explored in this Article, a compelling argument can be made that the judicial appointment of the foreperson is, or at least can appear to be, an act of partiality toward one party or the other, thereby violating a defendant's due process right to be tried by a fair and impartial judge. While the right to a trial before a fair and impartial judge, unlike the right to a trial by a fair and impartial jury, does not appear explicitly in the U.S. Constitution, that right has long been recognized as a fundamental aspect of due process of law as provided by the Fifth and Fourteenth Amendments to the U.S. Constitution. *See, e.g.*, *In re* Murchison, 349 U.S. 133, 139 (1955); Tumey v. Ohio, 273 U.S. 510, 523 (1927). The right encompasses a broad interpretation of what it means for a judge to be partial to one side and can be violated not only by actual partiality on the part of the trial judge, but also by the appearance of such partiality. *See Murchison*, 349 U.S. at 136. Moreover, the right to a trial before a fair and impartial judge is considered so fundamental that any violation of the right will lead to automatic reversal without recourse to harmless error review. *See* Chapman v. California, 386 U.S. 18, 23 n.8 (1967) (including the right to an impartial judge in a list of rights the violation of which requires automatic reversal); *see also* Rose v. Clark, 478 U.S. 570, 578 (1986) (noting that harmless error analysis "presupposes a trial, at which the defendant, represented by counsel, may present evidence and argument before an impartial judge and jury"). Because the claim that judicial appointment violates the right to an impartial judge is in large part reliant on precisely the same arguments advanced in this Article concerning the right to an impartial jury, I will make no further attempt here to distinguish between the two constitutional claims.

258. *Jaroma*, 630 A.2d at 1177.

259. *Id.*

260. *Id.*

offered for those arguments.[261] With that one contention clarified, the court ruled as follows:

> "Therefore, the right to trial by an impartial jury secured by . . . the New Hampshire Constitution is not directly implicated in this case." The defendant has failed to demonstrate that the court's action rises to the level of a constitutional violation or that he was prejudiced by the selection. Absent a finding of prejudice in this case, we will not reverse.[262]

The court did not address the ramifications of the judicial appointment itself, nor did it clarify how a defendant might ever prove actual prejudice in this setting.

By contrast, the California Court of Appeal in *Dorshkind v. Harry N. Koff Agency, Inc.*[263] engaged in a thorough analysis of the constitutional ramifications of the judicial act of selecting a foreperson. In that case, at the close of his charge to the jury, the trial judge appointed a specific juror to be foreperson.[264] When counsel questioned the propriety of the judge's actions, the judge explained his choice in these terms:

> 'In this case I have done it because, in my opinion, there are complicated issues here, and I chose a person to be foreman who, in my opinion, appeared to be most attentive during the evidence, and in the deliberations is most able to keep the jury in line with the complicated issues, and I do it purely on a subjective analysis because I think that the popularity contest sometimes indulged in does a disservice to everyone involved, so all of you have voiced your opposition and exception.'[265]

On appeal, the defendants argued that the judge's action deprived them of their constitutional right to a trial by jury.[266] Noting that it could find no relevant authority directly on point, the appellate court noted that it was nonetheless "not persuaded that the appointment of a jury foreman is either unimportant or that it is properly a subject of judicial discretion."[267]

The court began its analysis by highlighting the historical and constitutional importance of the right to trial by jury and, more specifically, the right to "unbiased and unprejudiced jurors," which it described as "an inseparable and inalienable part of the right to trial by

---

261. *Id.*
262. *Id.* (citations omitted).
263. 134 Cal. Rptr. 344 (Cal. Ct. App. 1976).
264. *Id.* at 344-45.
265. *Id.* at 345.
266. *Id.*
267. *Id.* at 346.

jury guaranteed by the Constitution."[268] Emphasizing the lengths to which trial courts go to instruct the jury not to read any sort of opinion into anything the judge has said or done, the court explained the logic compelling that instruction:

> It is well understood by most trial judges that it is of the utmost importance that the trial judge not communicate in any manner to the jury the judge's opinions on the case submitted to the jury, because juries tend to attach inflated importance to any such communication, even when the judge has no intention whatever of influencing a jury's determination.[269]

The court recognized the significant possibility that the mere designation by the judge of one juror as foreperson, with nothing more, may be imbued with meaning, even if unintended by the judge:

> If the trial judge is free to select the foreman of the jury, there will undoubtedly be some jurors who feel a certain amount of deference is due to the opinion of the person selected by the trial judge, regardless of the other instructions routinely given, which remind the jury that each juror has the right and the responsibility to arrive at his or her free choice in the matter at hand, without being influenced by any conduct—verbal or nonverbal—from the trial judge.[270]

Moreover, the court recognized that the selection of the foreperson can have a genuine impact on the manner and nature of a jury's deliberations; indeed, the court concluded that the trial judge's remarks in this particular case, suggesting that he selected the person he thought was "most able to keep the jury in line," indicated "a deliberate intention by the trial judge to influence the deliberations of the jury."[271] Finding that the judicial selection of the foreperson "constitutes an inherent danger to the inviolateness of the jury system," the court held that the California Constitution's guarantee of the right to trial by jury requires that a jury be permitted to select its own foreperson.[272] Furthermore, the court "adopt[ed] the premise that selection by a trial judge of the jury foreman constitutes reversible error without reference to proof of actual prejudice."[273] Although this groundbreaking case happened to involve

---

268. *Id.* at 346-47 (internal quotation marks omitted) (quoting Weathers v. Kaiser Found. Hosps., 485 P.2d 1132, 1140 (Cal. 1971)).

269. *Id.* at 347.

270. *Id.*

271. *Id.* (emphasis omitted).

272. *Id.*

273. *Id.* at 348.

civil litigation, subsequent California cases have applied the court's holding in the criminal context.[274]

While the California Court of Appeal purported to be analyzing the right to trial by jury found in the California Constitution, the same reasoning can and should be applied to the same right found in the Sixth Amendment to the U.S. Constitution. And that court, for some of the reasons that it articulated as well as for others that it did not address, reached the right conclusion. The nonrandom selection and appointment of a foreperson by the trial judge, in and of itself, carries with it a host of possibilities for the judge to exercise improper influence on the jury's deliberative process, whether intended or not. Indeed, it would seem impossible to imagine any scenario under which the deliberative process would not be influenced by the appointment, for even if the same person were to have been elected by the jurors themselves, the mere fact of the appointment has independent significance.

The court correctly recognized the overwhelming power and influence wielded by the trial judge. The court also correctly recognized the reality that judges will send and jurors will receive messages about the judge's opinions, whether or not on a conscious level, and that this process is exacerbated by the sometimes desperate need and desire on the part of any individual juror to be guided in his or her deliberations. In addition, the court correctly recognized the power of the foreperson to control the manner of the jury's deliberations. And most importantly, the court correctly recognized the danger that at least some jurors will feel that the opinions of the judicially appointed foreperson are entitled to some form of deference. The source of this deference could be the view that the judge had particular respect for this one juror or for his or her intelligence or judgment, that the judge suspected that this juror's views were likely to be in accord with those of the judge, or that the foreperson, merely on the basis of title, is entitled to some form of deference. Indeed, the source of the deference could be a combination of all of these factors. In any event, the designation by the trial judge of what may in effect be one "super-juror" seemed to be at the core of the court's concern.

One other feature of the court's opinion targeted the most critical issue in the constitutional analysis: any conscious effort on the part of a trial judge to influence the deliberative process—even if the judge's sole intent is to make the process more efficient, more orderly, or more egalitarian—is a blatant violation of the defendant's right to have a fair and impartial jury deliberate and decide facts without the influence of the trial judge. This logic suggests, of course, that the judicial

274. *See, e.g.*, People v. Perez, 260 Cal. Rptr. 474, 478 (Cal. Ct. App. 1989).

appointment of a foreperson is a violation of the defendant's rights even if the judge is actually trying to assist the defendant. The well-intentioned judge who is simply trying to move a case toward a verdict or who is trying to make sure that women and minorities are well represented over time is acting as much in contravention of the defendant's rights as the judge who intentionally selects the juror he or she perceives as most pro-prosecution.

Two other issues, not mentioned in the *Dorshkind* court's analysis, are equally important in analyzing the constitutional claim. First, there is the issue of whether the judge's appointment of the foreperson exempts that juror from designation as an alternate juror. It is presumably the case, as highlighted by the Supreme Court of New Hampshire in *Jaroma*, that all of the jurors, on an individual basis, have at that stage been found to be impartial.[275] Nonetheless, it is hard to imagine a serious debate about whether changing the actual composition of the jury would have an impact on the deliberative process. And the impact on the deliberative process comes in this instance, of course, from the trial judge, who has had played a significant role, in an intentional fashion, in forming the ultimate composition of the jury. Once again, the motivations of the trial judge would seem to be completely irrelevant to the core constitutional analysis; the intentional manipulation of the process by which alternates are selected from the pool of jurors, with whatever motivations in mind, constitutes the intentional exercise of influence over the deliberative process.

The second and more central issue is the impact of the social science concept of the "expectation effect." As noted earlier, the expectation effect is "one of the most well-established phenomena in social science."[276] It is simply blinking reality not to recognize that the trial judge, whether before the trial begins or as the trial proceeds, holds personal opinions about the merits of the case. Even if one assumes that the judge, acting in good faith, does everything in his or her power to mask those opinions, it once again blinks reality not to recognize that those opinions will be leaked to the jurors in a variety of ways. It seems virtually every social scientist would agree that the trial judge is likely to behave in ways that are designed to lead to the verdict that he or she believes is right, whether he or she does so consciously or without awareness. Allowing the trial judge to appoint the foreperson in a nonrandom fashion is nothing less than an open invitation for the judge to steer the jury toward a particular verdict, in plain contravention of the defendant's constitutional rights.

275. State v. Jaroma, 630 A.2d 1173, 1177 (N.H. 1993).
276. Note, *supra* note 187, at 1269.

## V. CONCLUSION

The practice of either requiring or allowing a trial judge to make a nonrandom appointment of one juror as foreperson, apparently quite widespread in at least certain parts of the country, plainly implicates a criminal defendant's Sixth Amendment right to have a fair and impartial jury deliberate, decide the facts of the case, and reach a verdict without outside influence from the trial judge. For a variety of reasons explored in this Article, the practice must be abandoned because it constitutes a violation of that right. The few justifications for the practice that can be identified are heavily outweighed by the requirement that the right to trial by a fair and impartial jury be scrupulously observed for, as the Supreme Court recently observed, "the jury right [can] be lost not only by gross denial, but by erosion."[277]

The trial judge is, by all accounts, the central and most powerful figure in any trial. Jurors look to the trial judge for all sorts of information about how to behave, in part because they are told to do so from the moment they enter the courtroom, and in part because they, like all people, respond to unfamiliar surroundings by searching out the most prominent authority figure and following that figure's leads. Trial judges, like the rest of us, hold opinions of their own, some formed on the basis of facts and evidence, some formed on the basis of biases and prejudices. And trial judges, like the rest of us, will convey those opinions in a variety of ways, verbal and nonverbal, consciously and without awareness. All of this happens in every trial, no matter what we may do to try to stop it, but if there is to be any pretense of observing the defendant's right to be tried by a jury that is free from the influence of the trial judge, it is clear that we must adopt practices that help minimize the judge's improper influence over the jury and prohibit practices that increase the probability and severity of that influence.

The judicial appointment of the foreperson of the jury falls into the category of practices that increase the probability and severity of judicial influence over the jury's deliberative process. Whether intended or not, the mere appointment of one particular juror over another is bound to be imbued with meaning by the jury. The judge's stamp of approval must mean something, whether it be that the judge perceives this juror as wiser in some way or as having views that are more likely to be in accord with those of the judge. Whatever meaning the jury gives to the appointment, it is a factor that would not exist were the jury left to elect its own leader.

When the judge appoints the foreperson in a fashion that exempts that juror from designation as an alternate juror, the judge is altering the composition and, therefore, the deliberative process of the jury. But

---

277. Jones v. United States, 526 U.S. 227, 248 (1999).

even when the appointment is timed in such a way that the composition of the jury is not effected, the judicial appointment of the foreperson can have a significant influence on the deliberative process because the foreperson controls the manner and style of deliberations, which social science research tells us can sometimes be outcome determinative. The choice of who should hold such a powerful position within the jury should belong to the jury itself, not to the trial judge. The judicial appointment of the foreperson has the potential to change not only who will hold the power of the foreperson, but also the level of power that that person may wield, as the already significant power of the foreperson is in all likelihood magnified by the mere fact of his or her appointment by the judge.

The judge's decision to appoint in a nonrandom fashion one particular juror to serve as foreperson must, by definition, be based upon one or more reasons, whether or not the judge can consciously articulate them. Some of these reasons are easy to categorize as improper reasons, such as racism, sexism, elitism, or the deliberate intent to influence the verdict in one direction or another. But even reasons that might in some way be viewed as either positive or benign, such as countering racism, sexism or elitism, or seeking to make the deliberative process fairer, more orderly or more efficient, are impossible to reconcile with our jurisprudence concerning the right to have a fair and impartial jury deliberate, decide the facts of the case, and reach a verdict without outside influence from the trial judge.

The impact of these various forms of judicial influence over the deliberative process is unknown and unknowable in any given case. Even if one were permitted to poll the jurors after the fact, such a polling process would be of little avail in most instances. Many jurors would be completely unaware of the myriad ways in which their own opinions or the deliberative process as a whole may have been altered by these dynamics, from whether a different foreperson would have made a difference to whether, even had the same foreperson been elected by the jury, the process was changed by the mere fact of the judicial appointment. Since much of the danger connected to the judge's influence lurks beneath the surface of conscious behavior, it is essentially impossible to assess. It is precisely for these reasons that any attempt to resolve the issue with a curative instruction is doomed to failure, and any effort after the fact to engage in some form of harmless error analysis would be futile and meaningless. A verdict rendered by a jury that is no longer impartial because it is no longer free from the outside influence of the trial judge is inherently tainted, calling into question the integrity of the entire proceeding.

To the extent that the practice of requiring or allowing a trial judge to appoint the foreperson of a jury is a developing trend in jury management, it must be reversed. To the extent that it is simply a reflection of past practice in certain jurisdictions, it must be stopped. The time has come for courts to recognize the practice for what it is: a blatant and unjustifiable violation of the Sixth Amendment right to be tried before a jury that is free from the outside influence of the trial judge.