August 11, 2005

David DiMarzio
Clerk of Court
United States District Court for the District of Rhode Island
One Exchange Terrace
Federal Building and Courthouse
Providence, RI 02903

Re: Comments on Proposed Local Rule 110: Disclosure of Non-Public Information

Dear Mr. DiMarzio:

The Reporters Committee for Freedom of the Press, the New England Press Association, the Newspaper Association of America, the Radio-Television News Directors Association, and the E.W. Scripps Company write to urge the Court to reject proposed local rule LR Gen 110, "Disclosure of Non-Public Information," which reads:

> Unless authorized to do so by the Court, no counsel, party, court employee, intern, court security officer, United States Marshal or Deputy United States Marshal, shall disclose or disseminate to any unauthorized person information relating to any pending case that is not a part of the public record.

The proposed local rule would impose a gag order in every pending case on all trial participants and court employees unless the judge explicitly authorizes the disclosure. The proposed rule therefore would limit the free flow of information concerning the judicial system. In our opinion, it would also violate the free speech rights of parties, attorneys, court employees, interns, security officers, United States Marshals, and Deputy United States Marshals, as well as First Amendment rights of access to discovery materials – violations that will likely result later in constitutional challenges. We hope you will contemplate our concerns while considering the adoption of this rule.

**1. The proposed rule restricts access to information about the judicial system, creating a policy that runs counter to open government, robust political discourse and judicial accountability.**

Restrictions on commentary about judicial proceedings are most likely to be instituted in cases that are exceedingly newsworthy because they involve politicians, famous people, or particularly egregious crimes. Suppressing the free flow of information in such cases, however, restricts the public's knowledge about politically significant issues, creating a significant First Amendment burden. *See, e.g., Bridges v. California*, 314 U.S. 252, 268-269 (1941) (noting that limits on comment about pending cases are "likely to fall not only at a crucial time but upon the most

important topics of discussion" and finding no suggestion in the Constitution that "the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression.")

Gagging speech about judicial proceedings not only deprives the public of socially and politically important information, but also hides a powerful branch of government behind a veil of secrecy. When judicial actions are obscured, the actors cannot be held fully accountable. *See, e.g., In re Oliver*, 333 U.S. 257, 270-271 (1948) (". . .[T]he forum of public opinion is an effective restraint on possible abuse of judicial power. . . . Without publicity, all other checks are insufficient: in comparison of publicity, all other checks are of small account.");*Gentile v. State Bar*, 501 U.S. 1030, 1035 (1991) ("The judicial system, and in particular our criminal justice courts, play a vital part in a democratic state, and the public has a legitimate interest in their operations.")

To acknowledge the overwhelming importance of the free flow of information, courts must employ great restraint in its restricting access. Because gag orders can constitute a prior restraint on speech, they must be narrow in scope and based on a standard that safeguards the First Amendment rights of the speaker. The proposed local rule defies both important principles because it is exceedingly overbroad and provides no standard for its application**.**

**2. The proposed rule violates the First Amendment rights of attorneys.**

The proposed local rule is unconstitutional because it gags attorneys without any consideration of their First Amendment rights. The Supreme Court has held that attorneys' speech deserves First Amendment protection, and that gag orders on attorneys are permissible only when narrowly tailored to serve a legitimate government interest.

The primary decision concerning the First Amendment rights of attorneys during judicial proceedings is *Gentile v. State Bar*, 501 U.S. 1030 (1991). In *Gentile*, the Supreme Court upheld Nevada's rule that prohibits an attorney from making extrajudicial statements that have "a substantial likelihood of materially prejudicing an adjudicative proceeding." *Id*. at 1033. After being disciplined under the rule, a Nevada attorney challenged the "substantial likelihood" standard, arguing that because it constituted a prior restraint on his speech, the rule should employ the more rigorous "clear and present danger" standard used in prior restraint cases against the media. *Id.* at 1074. (citing *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976)).

In approving a more lenient standard than the "clear and present danger" test, the Court concluded that attorneys are subject to a "less demanding standard" than other speakers because attorneys are officers of the Court with fiduciary obligations, and may be perceived by the public as particularly authoritative and highly persuasive. *Id.* at 1074. The court then acknowledged that "[w]hen a state regulation implicates First Amendment rights, the Court must balance those interests against the State's legitimate interest in regulating the activity in question." *Id.* at 1075. In order to appropriately balance those interests, the Court mandated that the restriction serve a legitimate government interest and be "narrowly tailored" to achieve that interest. *Id.* (utilizing test set forth in *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984)). The court upheld the Nevada rule, finding the "substantial likelihood" test to be a "narrow and necessary" one that

serves the legitimate purpose of protecting the defendant's right to a fair trial. *Id.* at 1075-76.

Although the holding in *Gentile* applies to disciplinary action imposed on attorneys after they make a statement, it also provides guidance as to the constitutionality of a gag order on attorneys. While it ultimately determined that the "substantial likelihood" test was a sufficient safeguard against violations of attorneys' First Amendment rights, the Supreme Court only reached this conclusion after a careful analysis of the First Amendment interests at stake. In reaching its conclusion, the court required the restriction to serve a "legitimate government purpose" and be "narrowly tailored."

In the U.S. District Court for the District of Rhode Island, a local rule already exists to regulate potentially prejudicial statements by attorneys. The rule mandates that lawyers refrain from making extrajudicial statements that create a "reasonable likelihood" of a "serious and imminent threat of interference with a fair trial." U.S. Dist. Ct. Rules D.R.I., Rule 39. By requiring a "serious and imminent" threat of interference, the current rule imposes the highest standard applicable to gag orders on an attorney's right of free speech.

In contrast, the proposed local rule does not consider *any* First Amendment rights of attorneys. It does not even restrict gag orders on attorneys to those cases where the threat of prejudicial harm is "substantial," the *minimal* test approved by the Supreme Court. Instead, the rule applies a gag order to all attorneys, during all proceedings, and contains no test whatsoever for determining when the *removal* of the gag order is appropriate. Instead, the imposition or removal of the gag order is left entirely to the judge's whim, which is an obviously unconstitutional standard.

**3. The proposed rule violates the First Amendment rights of parties, court employees, interns, security officers, United States Marshals and Deputy United States Marshals.**

Not only does the proposed rule impose an unconstitutional First Amendment burden on attorneys, but it creates an *even greater* unconstitutional burden on other court participants and officials. Without *any* sort of test, even the minimal "substantial likelihood" test, the proposed rule cannot withstand constitutional scrutiny.

The proposed rule fails both prongs of the test promulgated by the Supreme Court in *Gentile v. State Bar*, 501 U.S. 1030 (1991) and *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984). The necessary inquiry is whether the "practice in question [furthers] an important or substantial governmental interest unrelated to the suppression of expression" and whether "the limitation of First Amendment freedoms [is] no greater than is necessary or essential to the protection of the particular governmental interest involved." *Seattle Times Co.*, 467 U.S. at 32 (citing *Procunier v. Martinez*, 416 U.S. 396, 413 (1974)).

The District Court's proposed rule fails to meet the first prong, as it has not articulated any purpose behind the rule. Although most gag orders are instituted to protect the defendants' right to a fair trial, which is a laudable and "substantial" government interest, gag orders could be used

to further interests far less important. For example, the First Circuit struck down a gag order because it served no purpose except to prevent the defendant from using his status in the court proceedings to gain popularity and clients. *In re Perry*, 859 F.2d.1043, 1048-49 (1st Cir. 1988). Because the proposed rule provides no justification or appropriate circumstances for its use, it fails the first prong of the Supreme Court's test in *Gentile*.

The proposed rule also fails the second prong of the *Gentile* test, as it is far from "narrowly tailored." The rule imposes a gag order on *all* participants during *all* pending cases, unless the court authorizes the disclosure. This overbroad rule makes no effort whatsoever to narrow the scope of the gag order - either by limiting its application to certain trials, limiting its application to certain participants, or providing any standard to determine when its application is appropriate.

Although the First Circuit has not ruled on this issue, its courts could look to other circuits for guidance on the creation of an appropriate standard for judges to use when issuing gag orders. Eight other circuits have established tests to determine when gag orders may be applied to trial participants and witnesses. No circuit that has addressed the issue has approved gag orders without the requisite balancing of the First Amendment interests at stake.

The most protective standard, adopted by the Sixth, Seventh and Ninth circuits, requires either a showing of a "clear and present danger" or a "serious and imminent threat" of prejudicing a fair trial. *See, United States v. Ford*, 830 F.2d 596 (6th Cir. 1987) ("clear and present danger"); *Chicago Council of Lawyers v. Bauer*, 522 F.3d 242, 249 (7th Cir. 1975), *cert. denied sub nom. Cunningham v. Chicago Council of Lawyers*, 427 U.S. 912 (1976) ("serious and imminent threat"); *Levine v. United States*, 764 F.2d 590, 596 (9th Cir. 1985) ("clear and present danger"); *See also United States v. Brown*, 218 F. 3d 415, 426-427 (5th Cir. 2000) (articulating standards for sister circuits).

The Third, Fourth, Fifth and Tenth circuits have adopted a less stringent test for gag orders that requires a showing of a "substantial" or "reasonable" likelihood of prejudicing a fair trial. *See United States v. Scarfo*, 263 F.3d 80, 94 (3d Cir. 2001) ("substantial likelihood"); *In re Russell*, 726 F.2d 1007, 1010 (4th Cir. 1984) ("reasonable likelihood"); *United States v. Brown*, 218 F.3d at 427 ("substantial likelihood"); *United States v. Tijerina*, 412 F.2d 661, 666-67 (10th Cir. 1969) ("reasonable likelihood").

The Second Circuit requires three conditions to be met before administering a gag order. First, "the limitations on attorney speech should be no broader than necessary to protect the integrity of the judicial system and the defendant's right to a fair trial." *United States v. Salameh*, 992 F.2d 445, 447 (2d Cir. 1993). Second, the trial court must explore "whether other available remedies would effectively mitigate the prejudicial publicity." *Id.* Third, the trial court must give proper notice to all restrained parties and give each part the opportunity to be heard. *Id.*

Although the Eleventh Circuit has not directly addressed the appropriate test for gag orders on all trial participants, a U.S. District Court in Alabama recently ruled that gag orders placed solely on criminal defendants may be upheld only if the defendant's speech poses a "serious and imminent risk to the court's ability to conduct a fair trial." *United States v. Carmichael*, 326 F. Supp. 2d

1267, 1294 (M.D. Ala. 2004).

Thus, while the law is unsettled as to the exact standard that is appropriate for issuing gag orders, every circuit that has considered the issue has held that *some standard* is clearly necessary to protect the First Amendment rights of the parties. To conform to constitutional standards, the proposed rule must *at least* require some showing of likely injury to the administration of justice. Furthermore, the rule must be narrowed in scope to pose the least possible amount of First Amendment harm.

**4. The proposed rule unconstitutionally burdens the release of discovery materials.**

By prohibiting the release of "any information" about a pending case that is not part of the public record, the language of the proposed rule indicates a prohibition on the release of discovery materials. This prohibition disregards nearly 20 years of case law in the First Circuit establishing clear standards for evaluating the necessity of protective orders on discovery materials.

The First Circuit determined that protective orders prohibiting parties from divulging any discovery-related materials must only be issued when "good cause" exists. *Anderson v. Cryovac*, 805 F.2d 1, 17 (1st Cir. 1986 citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984)). In finding that "first amendment considerations cannot be ignored in reviewing discovery protective orders," the court held that the orders must be reviewed under Fed. R. Civ. P. 26(c), which establishes the general rules for protective orders, including the requirement of showing "good cause." *Id.* The Court further noted that the finding of "good cause" must be made on "a particular factual demonstration of potential harm, not on conclusory statements." *Id*. at 19.

In *Anderson*, the Court also noted two other requirements that must be met before a protective order is issued on discovery materials. Citing *Seattle Times Co.*, 467 U.S. at 34, the Court ruled that once the showing of "good cause" is met, the order only will be sustained if it is limited to the discovery context and does not restrict the dissemination of information obtained from other sources. *Anderson* at 16.

The First Circuit later extended its holding in *Anderson* and held that Fed. R. Civ. Pro. 26(c) implicitly provides that, absent a showing of "good cause" for keeping discovery materials confidential under a protective order, a party receiving discovery may make those materials public if it chooses to do so. *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 779-81 (1st Cir. 1988).

The proposed rule clearly ignores the requirements set forth by the Supreme Court in *Seattle Times Co.* and then specifically applied by the First Circuit in *Anderson* and *Liggett Group*. By providing no standards for the dissemination of discovery materials, and by failing to limit the restriction to discovery materials only, the proposed rule ignores Supreme Court and First Circuit precedents that safeguard First Amendment rights.

**Conclusion**

In summary, it is our opinion that the proposed local rule violates constitutional guarantee of freedom of speech, and as such would fail to survive judicial scrutiny. The proposal also ignores important public policy concerns.

The Rhode Island federal court already has adequate safeguards in place to protect First Amendment rights while ensuring the fair administration of justice. *See* U.S. Dist. Ct. Rules D.R.I., Rule 39 (prohibiting lawyers from disseminating prejudicial information that would pose a "serious and imminent threat" to a fair trial"); Fed. Rules Civ. Pro., Rule 26(c)(requiring "good cause" to be shown before issuing protective order on discovery materials). We see no purpose in additionally restricting the speech of trial participants and court agents and officers.

In light of these concerns, we strongly urge you to reject the proposed rule in its entirety. Thank you for your consideration.

Sincerely,

Lucy A. Dalglish, Esq.
Gregg P. Leslie, Esq.
Kimberley Keyes, Esq.
Amanda M. Groover, J.D. '06
The Reporters Committee for Freedom of the Press
1101 Wilson Blvd., Ste 1100
Arlington, VA 22209-2211

Robert A. Bertsche, Esq.
Chair, Media and Intellectual Property Group
Prince, Lobel, Glovsky & Tye
585 Commercial Street
Boston, MA 02109-1024
*Attorney for the New England Press Association*

Rene P. Milam
1921 Gallows Road Suite 600
Vienna, VA 22182
*Attorney for the Newspaper Association of America*

Kathleen Kirby
Wiley Rein & Fielding
1776 K Street, NW Suite 300
Washington, D.C. 20036

*Attorney for the Radio-Television News Directors Association*

Dave Giles, Esq.
312 Walnut St., Suite 2800
Cincinnati, OH 45202

*Attorney for the E.W. Scripps Company*

**Statements of Interest**

The Reporters Committee for Freedom of the Press is a voluntary, unincorporated association of reporters and editors that works to defend the First Amendment and freedom of information interests of the news media. The Reporters Committee has provided representation, guidance and research in First Amendment and freedom of information litigation since 1970. The Committee also has published a series of special reports on court secrecy, including *Anonymous Juries* in 2000*, Gag Orders* in 2001*, Access to Terrorism Proceedings* in 2002, *Secret Dockets* in 2003, and *Grand Juries* in 2004.

The New England Press Association is a nonprofit organization representing the interests of more than 500 member newspapers in the New England region. With a circulation of 5.4 million and a readership of 10.3 million, NEPA provides services and programs to help its members publish better and more profitable newspapers. NEPA recognizes the fundamental importance of the implied trust imposed on newspapers in the dissemination of public information. It stands for truth, fairness, accuracy and decency in the presentation of news as set forth in the Canons of Journalism. It opposes the publication of propaganda under the guise of news. It affirms the obligation of a newspaper to frank, honest and fearless editorial expression. It respects equality of opinion and the right of every individual to participate in the constitutional guarantee of freedom of the press. It believes in the newspaper as a vital medium for civic, economic, social and cultural community development and progress.

The Newspaper Association of America ("NAA") is a nonprofit organization representing the interests of more than 2,000 newspapers in the United States and Canada. NAA members account for nearly 90 percent of the daily newspaper circulation in the United States and a wide

range of non-daily newspapers. One of NAA's key strategic priorities is to advance newspapers' First Amendment interests, including the ability to gather and report the news.

The Radio-Television News Directors Association is the world's largest professional organization devoted exclusively to electronic journalism. Formed in 1946, RTNDA's membership encompasses more than 3000 news directors, news associates, educators and students in more than 30 countries. From its inception, RTNDA has encouraged excellence in electronic journalism.

The E.W. Scripps Company is a diverse media company with interests including newspaper publishing, broadcast television and national television networks. The company operates 21 daily newspapers, with a combined paid daily circulation of 1.1 million; 15 broadcast television stations, including six ABC affiliates and three NBC affiliates; and five cable and satellite television programming networks and a television retailing network totaling more than 84 million subscribers.